MINNESOTA MINING AND MANUFAC-
TURING COMPANY, Plaintiff,

v.

The TRAVELERS INDEMNITY COMPA-
NY, Great American Insurance Compa-
ny, as successor in interest to Anchor
Casualty Company of St. Paul, Minne-
sota, Commercial Union Insurance
Company, as successor in interest to
Employers Liability Assurance Corpo-
ration, Insurance Company of North
America, Inc., Northwestern National
Insurance Company, Defendants.

JOSLYN CORPORATION, Plaintiff,

v.

LIBERTY MUTUAL INSURANCE
COMPANY, Defendant,

The State of Minnesota, Through its At-
torney General and its Pollution
Control Agency, Intervenor–Plaintiff.

BITUMINOUS CASUALTY
CORPORATION, Plaintiff,

v.

TONKA CORPORATION, Defendant
and Counterclaimant,

Travelers Insurance Company, North Riv-
er Insurance Company, Industrial In-
demnity Company and United States
Fire Insurance Company, Great Ameri-
can Insurance Company, Zurich Insur-
ance Company, Fireman's Fund Insur-
ance Company, Mission National Insur-
ance Company, Twin City Fire Insur-
ance Company, Additional Defendants
on Counterclaim.

Nos. C4–88–1931, C9–88–2296
and C1–88–2244.

Supreme Court of Minnesota.

June 8, 1990.

G. Marc Whitehead, Thomas J. Barrett, Thomas C. Mielenhausen, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, John E. Heintz, Lisa I. LaTorre, Washington, D.C., for Minnesota Min. and Mfg. Co.

David M. Coyne, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, for Joslyn Corp.

Hubert H. Humphrey, III, Atty. Gen., Ann M. Shea, Sp. Asst. Atty. Gen., St. Paul, for intervenor-plaintiff, State of Minn., et al.

Kay Nord Hunt, Thomas E. Peterson, James C. Searls, Lommen, Nelson, Cole & Stageberg, P.A., Minneapolis, for Bituminous Cas. Corp.

Scott H. Peters, William J. Keppel, Dorsey & Whitney, Minneapolis, for Travelers Indem. Co.

John Q. McShane, Marcia M. Kull, Bowman & Brooke, Minneapolis, and Jerome C. Randolph, Donald A. Lane, Keating, Meuthing & Klekamp, Cincinnati, Ohio, for Great American Ins. Co., et al.

James T. Martin, Gislason, Martin & Varpness, Minneapolis, for Commercial Union Ins. Co., et al.

Paul G. Neimann, Thomas J. Shroyer, Moss & Barnett, Minneapolis, and Dennis M. Flannery, W. Scott Blackmer, Wilmer, Cutler & Pickering, Washington, D.C., for Ins. Co. of North America, Inc., et al.

Richard J. Nygaard, Patricia Ann Burke, Rider, Bennett, Egan & Arundel, Minneapolis, for Northwestern Nat. Ins. Co.

John F. Angell, Terry J. Bartz, Stich, Angell, Kreidler & Muth, P.A., Minneapolis, and James P. Whitters, III, Lee H. Glickenhaus, Gaston & Snow, Boston, Mass., for Liberty Mut. Ins. Co.

David F. Herr, John H. Gilmore, Maslon, Edelman, Borman, & Brand, Minneapolis, for Tonka Corp.

Paul G. Neimann, Moss & Barnett, Minneapolis, for Travelers Ins. Co.

Leon R. Erstad, Chadwick, Johnson & Condon, P.A., Minneapolis, for North River Ins. Co., et al.

Garrett E. Mulrooney, Maun, Green, Hayes, Simon, Johanneson & Brehl, St. Paul, and Robert J. Bates, Jr., Phelan, Pope & John, Chicago, Ill., for Zurich Ins. Co.

Gay B. Urness, Miller & Neary, Minneapolis, and William M. Savino, Gary D. Centola, Alan C. Eagle, Rivkin, Radler, Dunne & Bayth, Uniondale, N.Y., for Fireman's Fund Ins. Co.

Robert J. McGuire, Barbara A. Burke, Cousineau, McGuire, Shaughnessy & Anderson, Minneapolis, for Mission Nat. Ins. Co.

Charles E. Gillen, Sean E. Hade, Jardine, Logan & O'Brien, St. Paul, for Twin City Fire Ins. Co.

Charles E. Lundberg, Bassford, Heckt, Lockhart, Truesdell & Briggs, P.A., Minneapolis, and Thomas W. Brunner, James M. Johnstone, Robert R. Lawrence, Wiley, Rein & Fielding, Washington, D.C., amicus curiae, for Ins. Environment Litigation Ass'n.

David L. Lillehaug, Leonard, Street & Deinard, Minneapolis, and (Joanne B. Grossman, Eric C. Bosset, Covington & Burling, Washington, D.C., of counsel), for amici curiae, American Petroleum Institute, et al.

Hubert H. Humphrey, III, Atty. Gen., Steven Shakman, Ann M. Shea, Sp. Asst. Attys. Gen., St. Paul, amici curiae, for State of Minn., et al.

KEITH, Justice.

These three cases present certified questions from the federal district court in Minnesota requiring us to decide whether the costs of complying with directives is-

sued by state and federal environmental agencies to clean up groundwater contamination caused by pollution are covered under the insureds' comprehensive general liability insurance policies.

The cases present similar factual backgrounds. Tonka Corporation ("Tonka"), Joslyn Corporation ("Joslyn") and Minnesota Mining and Manufacturing Company ("3M") have been insured by the various insurance companies involved in these cases under comprehensive general liability ("CGL") insurance policies dating back several decades. The policies in each instance contain nearly identical language by which the particular insurance company involved agreed "to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of * * * property damage to which this insurance applies, caused by an occurrence."[1] During the years the policies were in effect, the insureds in these cases were engaged in manufacturing operations which produced hazardous chemical wastes. Like many other manufacturers at the time, the insureds disposed of these wastes by underground burial or by the use of settling pools. Over the years the chemical wastes have escaped into the soil, contaminating the soil and the groundwaters. The Minnesota Pollution Control Agency ("MPCA") has become involved in investigating soil and groundwater contamination at the waste disposal sites used by the insureds in these cases.

In the disposal site used by 3M, the MPCA requested that 3M participate in a hydrogeologic study. 3M financed much of the study and later commissioned a surface cleanup of deteriorating drums at the site. In 1983, 3M entered a consent order with the MPCA and the United States Environmental Protection Agency ("EPA") agreeing to clean up the soil and groundwater contamination at the sites and to reimburse the agencies for the past and future ex-

penses associated with the cleanup effort. In exchange, the agencies released 3M from liability under state and federal pollution statutes, including the Minnesota Environmental Response Liability Act ("MERLA"), Minn.Stat. ch. 115B, and from all common law liabilities.

In the cases of Joslyn and Tonka, the MPCA pursuant to MERLA issued a Request for Response Action ("RFRA") which directed the insureds to conduct an investigation of the soil and groundwater contamination at their sites and then to prepare and implement a response plan to remedy the contamination. The RFRA also advised the insureds that their failure to take the requested action would result in the MPCA undertaking the cleanup, after which it would seek to recover its costs from the insureds, or it could seek a court order to compel them to clean up the site and impose civil penalties. The insureds were also advised that they could be liable for permanent damages caused to the natural resources of the state, and that the MPCA would seek reimbursement of its own expenses. Joslyn entered into a consent order with the MPCA in which it agreed to investigate suspected contamination, develop and implement a cleanup plan, and reimburse the MPCA for its expenses. In return, MPCA agreed that it would not pursue any of its statutory or common law remedies against Joslyn. Tonka has not entered a consent order, but has complied with the RFRA by taking the requested actions.

Each of the insureds has spent considerable amounts investigating the extent of the contamination and complying with the applicable RFRAs and consent orders. The insureds separately brought suit in federal court against the insurance companies who sold the CGL insurance policies during the years that the groundwater contamination was occurring. The insurance companies in each case brought motions for summary

---

**1.** The slight variations in the language of the specific policies do not affect our analysis. The policies issued before 1966 provided indemnity against bodily injury or property damage caused by an "accident." In 1966 the policies were changed to provide coverage for an "occur-

rence" rather than an "accident." *See,* Gordon and Westendorf, *Liability Coverage for Toxic Tort, Hazardous Waste Disposal and Other Pollution Exposures,* 25 Idaho L.Rev. 567, 575 (1988–89). This change also does not affect our analysis.

judgment seeking declarations that claims for environmental cleanup costs mandated by the MPCA are not covered "damages" within the meaning of the CGL policies. In each case the issue of whether these costs are covered under the terms of the insurance policies has been certified to this court for resolution under applicable Minnesota law.[2]

The insurance companies argue that the CGL policies indemnify the insureds only when the insureds are legally obligated to pay "damages" to a third party. They assert that the term "damages" should be interpreted in the insurance policies to contemplate amounts paid as monetary compensation for injuries to third parties, and should not cover amounts paid to comply with injunctive orders. The insurance companies argue that the consent orders and the RFRAs issued by the MPCA which require that the insureds in these cases undertake to clean up the contaminated sites are akin to injunctive orders.[3] They assert that they must indemnify the policyholders against action taken against them by the MPCA only when the MPCA is seeking compensation for the monetary value of permanent damage to the natural resources of the state, as permitted by Minn.Stat. § 115B.04, subd. 1(c) (1988). In

essence, they are arguing that the term "damages" as used in the CGL policies embodies a distinction between injunctive or other forms of equitable relief, and legal or monetary damages. They argue that the actions taken by the MPCA in these cases seek equitable relief, including restitutionary relief and therefore are not covered under the policies.

The insurers cite as authority for their position *Continental Ins. Co. v. Northeastern Pharmaceutical & Chem. Co.*, 842 F.2d 977 (8th Cir.) (en banc) *sub nom. Missouri v. Continental Ins.*, cert. denied, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) [hereinafter *"NEPACCO"*]. That case arose from an earlier action by the EPA against NEPACCO seeking abatement and response costs for EPA's "cleanup" of the contaminated waste site. EPA's action was based in part on the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9604, 9606, 9607, an act similar to MERLA, the Minnesota statute at issue in these cases. The court in *NEPACCO* held that the costs of cleaning up soil and groundwater contamination in compliance with the EPA action did not constitute "damages" within the meaning of identical

---

**2.** The following issues were certified to this court in the following cases:

*Bituminous Cas. Corp. v. Tonka*
Under Minnesota law, are amounts expended by Tonka Corporation in complying with the Request for Remedial Investigation and Request for Response Action issued by the Minnesota Pollution Control Agency pursuant to Minn.Stat. §§ 115B et seq., "damages" as that term is used in the comprehensive general liability policies issued to Tonka Corporation by the plaintiff and the additional counter-claim defendants?

*Joslyn Corp. v. Liberty Mutual Ins. Co.*
Under Minnesota law, are amounts expended by Joslyn for the investigation and remediation of environmental contamination pursuant to a consent order entered in settlement of an administrative action brought pursuant to the Minnesota Environmental Response and Liability Act, [Minn.Stat.] §§ 115B.01–115B.37, "damages" as that term is used in comprehensive general liability insurance policies issued by Liberty Mutual Insurance Company to Joslyn?

*Minnesota Mining and Mfg. Co. v. Travelers Ins. Co.*

Whether, under Minnesota law, the costs incurred by 3M to clean up contamination pursuant to a consent agreement with the State of Minnesota and the United States are "damages" within the meaning of the comprehensive general liability (CGL) policies issued by defendants?

**3.** Section 115B.04, subd. 1(a) and (b) of MERLA holds the person or corporation who caused the pollution liable for "response" and "removal" costs, *i.e.*, clean up costs. MPCA first seeks to get the responsible party to restore the contaminated soil and groundwater. A request for response action (RFRA) is issued. The responsible party then either cooperates with the request or refuses, at which point the MPCA uses Superfund monies to clean up the site themselves. Minn.Stat. § 115B.17, subd. 1(a) (1988), 115B.20, subds. 2(b), (d) (1988). MPCA can then seek to recover its expenditures from the responsible party. Minn.Stat. § 115B.17, subd. 6 (1988). MPCA can also bring an action to compel compliance with the RFRA. Minn.Stat. 115B.18, subd. 2 (1988).

CGL insurance policies. *Id.* at 985–86. The court reasoned under Missouri law, that the term "damages" in the insurance context has the accepted technical meaning of "legal damages" that does not include equitable monetary relief. Thus, claims seeking any form of equitable relief were not claims seeking "damages" and were not covered under the CGL policies. *Id.*

In interpreting insurance contracts under Minnesota law, we must give effect to the intentions of the parties as it appears from the terms used in the contract. *Dairyland Ins. Co. v. Implement Dealers Ins. Co.*, 294 Minn. 236, 244–45, 199 N.W.2d 806, 811 (1972). If the terms of an insurance policy are not specifically defined, they must be given their plain, ordinary and popular meaning. *Smith v. St. Paul Fire & Marine Ins. Co.*, 353 N.W.2d 130, 132 (Minn. 1984). Ambiguous terms in an insurance policy are to be resolved against the insurer and in accordance with the reasonable expectations of the insured. *Columbia Heights Motors, Inc. v. Allstate Ins. Co.*, 275 N.W.2d 32, 36 (Minn.1979) (citations omitted). Ambiguity exists if the language of the policy is reasonably subject to more than one interpretation. *Id.* at 34.

■ The insurance companies assert that the term "damages" as used in the CGL policies unambiguously embodies a distinction between legal and equitable remedies. This argument is unpersuasive. Minnesota law places little value on antiquated distinctions between legal and equitable claims which have persisted from the historic separation of courts of law and chancery. Equity and chancery jurisdiction were abolished, and actions in law and equity were combined by an act of the Territorial Assembly in 1853. Act of March 5, 1853, ch. 57, §§ 19–33, 1849–1858 Pub.Stat. 480–82. We hold that the term "damages" as used in the CGL policies in these cases does not have an unambiguous technical meaning in the insurance industry which draws a distinction between actions seeking purely monetary relief and actions seeking forms of equitable relief. The position urged by the insurance companies is contrary to our rules of insurance contract interpretation

which require that undefined terms be given their "plain, ordinary and popular meaning." *St. Paul Fire & Marine*, 353 N.W.2d at 132.

Our holding in *City of Thief River Falls v. United Fire & Cas. Co.*, 336 N.W.2d 274 (Minn.1983) does not compel us to recognize an unambiguous technical distinction between legal and equitable claims in the term "damages." In that case we held that an insurer was not required to provide a defense for the insured city in an action seeking a writ of mandamus against the city. *Id.* at 275–76. We found that there was no duty to defend because the action for a writ of mandamus was not an action seeking "damages." *Id.* at 276. *Thief River Falls* is not controlling in these cases, because we are presented with different types of claims asserted against the insureds and different sets of expectations by the insurers and the insureds. Unlike *Thief River Falls*, property damage has occurred in these cases which has given rise to claims against the insureds that require them to pay amounts to reimburse the MPCA and to make out-of-pocket expenditures to pay contractors or their own employees to restore property to its pre-polluted condition. In *Thief River Falls*, the claim against the insured required only that the insured city commence condemnation proceedings. Moreover, even if the city eventually was required to pay money in the form of a condemnation award, that was merely an exchange of money for property of equal value and was not made to compensate the claimant for injury to property.

In the present context, the meaning of the term "damages" is ambiguous as it is susceptible to more than one reasonable interpretation. The policy language, "all sums which the insured shall become legally obligated to pay as damages because of property damage," can reasonably be interpreted to cover any claim asserted against the insured arising out of property damage, which requires the expenditure of money, regardless of whether the claim can be characterized as legal or equitable in nature. This interpretation is supported by the dictionary definition of "damages"

which makes no distinction between damages at law and actions in equity. *See* Webster's Third New International Dictionary Unabridged 571 (1961) ("damages" are "the estimated reparation in money for detriment or injury sustained: compensation or satisfaction imposed by law for a wrong or injury caused by violation of a legal right.") Even in *NEPACCO*, the case relied upon by the insurers, the court concluded that the term "damages" was ambiguous from the standpoint of the lay insured. *NEPACCO*, 842 F.2d at 985. The court stated that "damages" could "reasonably include all monetary claims, whether such claims are described as damages, expenses, costs or losses." *Id.* On the other hand, a "technical" interpretation of the term "damages," which draws a distinction between actions at law and in equity, is within the understanding of individuals trained in the law. This view is supported by the reasoning adopted in *NEPACCO* that the term "damages" is intended as a limitation of the term "all sums." According to this view, a broad interpretation of the term "damages" would render that term surplusage, as the insurer would then be obligated to pay "all sums which the insured shall become legally obligated to pay." *Id.* at 986.[4] Thus, the term "damages" is ambiguous when used in this context.

The ambiguity is especially apparent in instances where the MPCA asserts a claim against an insured for reimbursement of its own expenses associated with the investigation and cleanup of a contaminated site. *See* Minn.Stat. § 115B.17, subd. 6. The claim seeks to compel the insured to pay money to compensate the agency for amounts it has lost because of the contamination. It is reasonable to interpret the insurance policy to provide coverage of such a claim. However, a claim for reimbursement of expenses also can be characterized as an equitable claim for restitution rather than a claim for money damages. *See, e.g., Bowen v. Massachusetts,* 487 U.S. 879, 891–903, 108 S.Ct. 2722, 2731–36, 101 L.Ed.2d 749 (1988).

The ambiguity inherent in the term "damages" as used in this context is further exemplified by the sharp division in case authority from other jurisdictions which have ruled on whether costs associated with groundwater cleanup mandated under the federal statute CERCLA are covered under similar CGL policies. Some jurisdictions have interpreted the term "damages" to not cover clean up costs, but instead to apply only to claims asserted at law against the insured which seek a judgment awarding monetary compensation to an injured third party.[5] A greater number, however, have interpreted the term "damages" in cases involving claims brought under CERCLA to include any sum expended under sanction of law.[6] Thus, in this

---

**4.** We disagree with the Eighth Circuit in *NEPACCO* that a broad interpretation of the term "damages" renders that term surplusage. This argument ignores that the "damages" for which the insurer must provide coverage is limited by the clause "because of property damage." The language of the policy, when read as a whole, indicates that sums which the insured becomes legally obligated to pay are not covered unless related to "property damage caused by an occurrence."

**5.** *See, e.g., Cincinnati Ins. Co. v. Milliken & Co.,* 857 F.2d 979, 981 (4th Cir.1988) (applying South Carolina law); *Continental Ins. Co. v. Northeastern Pharm. & Chem. Co.,* 842 F.2d 977, 985–87 (8th Cir.) (applying Missouri law), *cert. denied, sub nom. Missouri v. Continental Ins. Co.,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); *Maryland Cas. Co. v. Armco, Inc.,* 822 F.2d 1348, 1352 (4th Cir.1987) (applying Maryland law), *cert. denied,* 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988); *Aetna Cas. & Sur. Co. v.*

*Gulf Resources & Chem. Corp.,* 709 F.Supp. 958, 961–62 (D.Idaho 1989); *Verlan, Ltd. v. John L. Armitage & Co.,* 695 F.Supp. 950, 954–55 (N.D. Ill.1988) (applying Illinois law); *W.C. Hayes v. Maryland Cas. Co.,* 688 F.Supp. 1513, 1515 (N.D. Fla.1988) (applying Florida law); *Travelers Ins. Co. v. Ross Electric of Wash., Inc.,* 685 F.Supp. 742, 744–45 (W.D.Wash.1988) (applying Washington law); *Patrons Oxford Mut. Ins. Co. v. Marois,* 573 A.2d 16, 18–20 (Maine 1990); *AIU Ins. Co. v. Santa Clara Cty Super. Ct.,* 213 Cal. App.3d 1219, 1231–1235, 262 Cal.Rptr. 182, 189–191 (distinguishing *Aerojet General Corp. v. San Mateo Cty. Super. Ct.,* 211 Cal.App.3d 216, 257 Cal.Rptr. 621, on basis of facts and legal reasoning), *rev. granted* (in bank), 264 Cal.Rptr. 354, 782 P.2d 595 (1989).

**6.** *See, e.g., Avondale Indus., Inc. v. Travelers Indem. Co.,* 887 F.2d 1200, 1206–07 (2d Cir.1989) (applying New York law); *Jones Truck Lines v. Transport Ins. Co.,* No. 88–5723 (E.D.Pa. May 10,

context, the term "damages" is ambiguous and therefore the ambiguity must be resolved in accordance with the reasonable expectations of the insured. *Columbia Heights Motors,* 275 N.W.2d at 36.

It is consistent with the reasonable expectations of the insureds under these policies that the clean up costs be covered. Another court, reaching the same conclusion, noted that "[i]t would come as an unexpected, if not incomprehensible, shock to the insureds to discover that their insurance coverage was being denied because plaintiff chose to frame his complaint in equity rather than in law." *Aerojet–General Corp. v. San Mateo Cty. Super. Ct.,* 211 Cal.App.3d 216, 229, 257 Cal.Rptr. 621, 628, *rev. denied,* 211 Cal.App.3d 216, 258 Cal.Rptr. 684 (1989). If a narrow, technical definition of the term "damages" was intended by the insurance companies, it was their duty to make that intention clear. The insureds purchased these "comprehen-sive general liability" policies expecting coverage against most legal liabilities which could arise out of their own acts or omissions, including liabilities which were unknown at the time. The standard language used in the policy is broad. The insurers agreed that they "will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies caused by an occurrence." The utility of the policy would be seriously called into question if coverage is permitted to hinge on such a fortuitous event as whether a plaintiff bringing an action against the insured has framed his complaint in equity rather than in law. Clearly the insureds under these policies contemplated greater certainty when they purchased the policies. They could reasonably expect the policy to provide coverage for any economic outlay compelled by law to

1989) (unpublished in F.Supp., but available at 1989 WL 49517; 57 U.S.L.W. 2699) (applying Missouri law and finding that 8th Circuit's decision in *Northeastern, supra* n. 5, in favor of insurer was "not based on Missouri caselaw or applicable rules of construction under Missouri law" and therefore was not controlling (1989 WL 49517 at 20)); *Chesapeake Utils. Corp. v. American Home Assur. Co.,* 704 F.Supp. 551, 558–61, 565 (D.Del.1989) (applying Maryland law and finding that the 4th circuit in *Armco, supra* n. 5, misstated Maryland law and that "sizeable and growing body of case law has rejected *Armco's* reasoning" (*Chesapeake* at 560); also applying Delaware law and declining to overturn its decision in *New Castle County, infra* ); *American Motorists Ins. Co. v. Levelor Lorentzen, Inc.* No. 88–1994 (D.N.J. Oct. 14, 1988) (unpublished in F.Supp., but available at 1988 WL 112142; 57 U.S.L.W. 2270) (applying N.Y. law); *Intel Corp. v. Hartford Accident & Indem. Co.,* 692 F.Supp. 1171, 1186–93 (N.D.Cal. 1988) (applying California law); *United States Fidelity & Guar. Co. v. Thomas Solvent Co.,* 683 F.Supp. 1139 (W.D.Mich.1988) (applying Michigan law); *Centennial Ins. Co. v. Lumbermens Mut. Cas. Co.,* 677 F.Supp. 342, 349–50 (E.D.Pa. 1987) (applying Pennsylvania law); *New Castle County v. Hartford Accident & Indem. Co.,* 673 F.Supp. 1359, 1365–66 (D.Del.1987) (applying Delaware and Maryland law); *Township of Gloucester v. Maryland Cas. Co.,* 668 F.Supp. 394, 398–400 (D.N.J.1987) (applying New Jersey law); *Fireman's Fund Ins. Co. v. Ex–Cell–O Corp.,* 662 F.Supp. 71, 75 (E.D.Mich.1987) (applying Michigan law); *Consolidated Rail Corp. v. Certain Underwriters at Lloyds,* No. 84–2609 (E.D.Pa. June 5, 1986) (unpublished in F.Supp., but available at 1986 WL 6547) (applying Pennsylvania law), *aff'd,* 853 F.2d 917 (3rd Cir.1988); *C.D. Spangler Constr. Co. v. Industrial Crankshaft & Eng'g Co.,* 326 N.C. 133, ——, 388 S.E.2d 557, 565–69 (1990) (discussing four theories other jurisdictions have used to find coverage, then resting its holding for coverage on basis that term "damages" was not used in its legal and technical sense in the CGL policies); *Boeing Co. v. Aetna Cas. & Sur. Co.,* 113 Wash.2d 869, 877–85, 784 P.2d 507, 511–515 (1990) (holding "damages" in CGL policies does not distinguish between sums awarded on legal or equitable basis and noting that 56 judges across the country agree that "damages" includes clean-up costs); *Aerojet–General Corp. v. San Mateo Cty. Super. Ct.,* 211 Cal.App.3d 216, 225–29, 232–37, 257 Cal.Rptr. 621, 626–28, 631–634 (noting greater weight of authority holds that response costs incurred under CERCLA are "damages because * * * of property damage"), *rev. denied,* 211 Cal.App.3d 216, 258 Cal.Rptr. 684 (1989); *United States Fidelity & Guar. v. Specialty Coatings Co.,* 180 Ill.App.3d 378, 390–95, 129 Ill.Dec. 306, 314–317, 535 N.E.2d 1071, 1079–82 (1989); *United States Aviex Co. v. Travelers Ins. Co.,* 125 Mich.App. 579, 586, 336 N.W.2d 838, 843 (1983); *Broadwell Realty Servs., Inc. v. Fidelity & Cas. Co. of N.Y.,* 218 N.J.Super. 516, 525–30, 528 A.2d 76, 81–83 (1987); *cf. Port of Portland v. Water Quality Ins. Syndicate,* 796 F.2d 1188, 1193–94 (9th Cir.1986) (applying Oregon law and holding "discharge of pollution into water causes damage to tangible property and hence cleanup costs are recoverable under a property damage liability clause").

rectify or mitigate damage caused by the insured's acts or omissions. *See United States Fidelity & Guar. Co. v. Thomas Solvent Co.*, 683 F.Supp. 1139, 1168 (W.D. Mich.1988) ("the insured ought to be able to rely on the common sense expectation that property damage within the meaning of the policy includes a claim which results in causing him to pay sums of money because his acts or omissions affected adversely the rights of third parties.")

The ordinary understanding of the term "damages" upon which the insureds could base a reasonable expectation of coverage is "the estimated reparation in money for detriment or injury sustained: compensation or satisfaction imposed by law for a wrong or injury caused by a violation of a legal right." *Webster's* at 571. Damages are typically regarded as the sum awarded to a third person as compensation for loss or injury. *Perl v. St. Paul Fire & Marine Ins. Co.*, 345 N.W.2d 209, 212 (Minn.1984). The costs associated with cleaning up the contamination are more aptly characterized consequential damages flowing from the direct damage caused to the environment. Damages which are causally related to covered "property damage" should also be covered under the language of the policy. *Federated Mutual Ins. Co. v. Concrete Units, Inc.*, 363 N.W.2d 751, 757 (Minn. 1985). The nature of the claims asserted by the MPCA and the EPA against the insureds amount to a claim for damages, as a reasonable insured would interpret that term, and as the insured could reasonably expect coverage.

All of the elements of a claim for damages are present in the agencies' claims against the insureds, *i.e.*, the insureds are under a legal obligation to provide compensation to an injured third party. The insureds in these cases have caused the contamination of groundwater beneath their waste disposal sites. Pollution of the groundwater is damage to public property. *Aerojet*, 211 Cal.App.3d at 229, 257 Cal. Rptr. at 629.[7] The state on behalf of its

citizens has a proprietary interest in the natural resources of Minnesota. Minn. Stat. §§ 105.38, 105.41. The MPCA as an agency of the state is the named trustee of the waters of the state. Minn.Stat. §§ 115B.17, subd. 7; 115.03 (1988). Thus, for the purposes of this analysis, the state is the injured third party asserting claims against the insureds.

Compensation for the injury to the water resources of Minnesota has been and will be paid to the state. The consent orders entered in these cases and the RFRAs issued by MPCA require the insureds to pay money directly to the state. The remainder of the compensation will be paid in kind. Instead of the state conducting the cleanup of the contaminated groundwater, the insureds will perform the work themselves, or, more accurately, will pay employees or contractors to clean up the contaminated groundwater, thereby incurring direct out-of-pocket expenses. The fact that the insureds rather than the state perform the work has no effect on whether the amounts expended by the insureds constitute compensation paid to the state for its injury. If the insured fails to comply with MPCA's request to clean up the contamination, then MPCA is empowered to conduct the clean-up itself, then recover its costs from the insured. Minn.Stat. § 115B.17, subd. 6. Therefore, the fact that the costs were incurred by the insured performing the work themselves should not affect insurance coverage of these costs. *See Chemical Applications Co. v. Home Indem. Co.*, 425 F.Supp. 777, 779 (D.Mass.1977). It is obviously the better public policy to encourage responsible parties to take immediate action themselves to mitigate and remedy groundwater contamination rather than await a state operated clean up effort at a later date.

The insurance companies argue that the CGL policies provide coverage only when a third party plaintiff brings a traditional civil lawsuit against the insured seeking

---

7. *See also, e.g., Port of Portland*, 796 F.2d at 1193–94 (holding oil pollution in Oregon waters owned by state is injury to tangible property); *Intel*, 692 F.Supp. at 1185 (similar under Califor-

nia law); *Broadwell*, 218 N.J.Super. at 527–28, 528 A.2d at 82 (similar under New Jersey law using *parens patriae* doctrine).

monetary compensation for injury to property. This construction of the insurance policies is too narrow. The issue of coverage does not depend merely on the form of action taken against the insured. Surely the legal proceedings commenced by MPCA against the insureds is equally coercive as a civil judgment against the insured. Because of MERLA, the insureds are under a legal obligation to expend amounts to remedy injuries to the state's natural resources. The fact that the legal obligation is in the form of a consent order or is mandated by a RFRA rather than a civil judgment does not change the nature of the obligation. These are merely the forms used by MPCA to compel the clean up of a contaminated site. The consent orders impose a legal obligation on the insureds. *See Jostens Inc. v. CNA Ins./Continental Cas. Co.,* 403 N.W.2d 625, 631 (Minn.1987) (settlement agreement imposed legal obligation to pay on insured). The RFRAs are backed by the availability of a civil judgment against the insureds to compel the insureds to conduct the clean up or to compel reimbursement of MPCA's expenses in cleaning up the contamination itself. Minn.Stat. §§ 115B.18, subd. 2; 115B.17, subd. 6. *See, e.g., Intel Corp. v. Hartford Accident & Indem. Co.,* 692 F.Supp. 1171, 1190, 1190 n. 3 (N.D.Cal. 1988); *Centennial Ins. Co. v. Lumbermens Mut. Cas. Co.,* 677 F.Supp. 342, 349–50, 350 n. 23 (E.D.Pa.1987); *Fireman's Fund Ins. Co. v. Ex–Cell–O Corp.,* 662 F.Supp. 71, 75 (E.D.Mich.1987); *Broadwell Realty Servs., Inc v. Fidelity & Cas. Co. of N.Y.,* 218 N.J.Super. 516, 527, 528 A.2d 76, 82 (1987).

Liability for groundwater contamination has been recognized in Minnesota for many years. Minnesota was one of the first American jurisdictions to adopt the strict liability rule of *Fletcher v. Rylands,* 1 Exch.L.R. 265, 279 (1865, 1866) (imposing strict liability for damage caused by anything kept on one's property that would naturally cause harm if it escaped), *aff'd, Rylands v. Fletcher,* L.R. 3 H.L. 330 (1868) (cited in *Cahill v. Eastman,* 18 Minn. 292, 293–94, 306, 321 (1872)). Strict liability specifically for the contamination of groundwater was imposed as early as 1895 in *Berger v. Minneapolis Gaslight Co.,* 60 Minn. 296, 298, 300, 62 N.W. 336, 336–37 (1895). The state has prohibited pollution of drinking water supplies, including groundwater, since 1885. *See* Act of March 7, 1885, ch. 225, 1885 Minn.Gen. Laws 296 (codified at Minn.Stat. ch. 6 § 99a (1879–1888 Supp.Vol. 2)). This act also empowered a state agency, among other things, to compel a party responsible for the pollution of drinking water supplies to "remedy the pollution, or to cleanse or purify the polluting substances." *Id.; see also* Minnesota Revised Laws § 2147 (1905). Thus, the parties in these cases were aware of the potential liability for groundwater contamination at the time they entered the insurance policies at issue in these cases. The advent of MERLA and other environmental statutes have merely changed the form of the liability for groundwater pollution, not the nature of that liability. Indeed, the insurers have conceded that claims asserted by the MPCA under MERLA for damages to the natural resources of the state are covered under the policies. *See* Minn.Stat. § 115B.04, subd. 1(c) (1988). The MERLA remedies merely update the old statutory and common law liabilities, which have proved to be ill-suited for the prompt resolution of toxic tort injuries. *See CPS Chem. Co. v. Continental Ins. Co.,* 222 N.J.Super. 175, 189, 536 A.2d 311, 318 (1988).

Finally, the remedy imposed by MERLA requiring that the responsible party clean up the contaminated property was not novel or unforeseeable to the insured or the insurance companies. This remedy has existed under prior statutes and, moreover, the costs of restoring property to its original condition has been a long-recognized measure of damages in common law pollution cases. *See Heath v. Minneapolis, St. P. & S.S.M.R. Co.,* 126 Minn. 470, 475, 148 N.W. 311, 312–13 (1914). Under the common law, damages of this kind are typically limited to the diminution in the value of the damaged property if the cost of restoring the property to its original condition would exceed that value. *Id.;* D. Dobbs, *Hand-*

*book of the Law of Remedies*, 146, 312–18 (1973). The MERLA clean up requirement did not expand the common law remedy for pollution of property so that an order to clean up the contamination would not be within the reasonable expectation of the insured.

We conclude that the policy language "damages because of * * * property damage" is ambiguous with regard to the costs of the MPCA-mandated cleanup. The ambiguity in this context must be construed against the insurers to give effect to the reasonable expectations of the insureds. We are not "opening the door," as the insurers assert, to insurance coverage of all business expenses which are mandated by the government, such as the cost of complying with OSHA safety regulations or an order by a fire marshall to make property owned by the insured safer against the risk of fire. These types of costs are not covered by the insurance policies simply because no property damage has occurred. The policies only provide coverage for sums which the insured becomes legally obligated to pay because of property damage. Purely preventative measures are not covered in the absence of property damage.

Because of the limited factual record before us, we cannot undertake to decide the exact scope of coverage provided by the policies. We leave to the federal district court the task of determining precisely which costs associated with the clean up of the contaminated sites will be covered. We were presented with certified questions asking broadly whether *any* of the clean up costs are covered under the CGL policies. We hold that expenditures mandated by the Minnesota Pollution Control Agency pursuant to the Minnesota Environmental Response and Liability Act, Minn.Stat. ch. 115B, which are necessary to effectuate the cleanup of contamination which has already occurred to the state's water re-

sources, are "damages because of * * * property damage" within the meaning of the comprehensive general liability insurance policies issued by these defendants.

The certified questions are affirmatively answered.

KELLEY, COYNE and SIMONETT, JJ., dissent with opinions.

KELLEY, Justice (dissenting).

I respectfully dissent. The comprehensive liability insurance policies involved in these cases contain substantially identical language obligating the insurer involved "to pay on behalf of the insured all sums which the insured shall become legally obligated to pay *as damages* because of * * * property damage to which the insurance applies, caused by an occurrence." (Emphasis added). The construction of that insuring agreement adopted by the majority completely ignores the *as damages* phrase and changes the whole meaning of the insuring agreement from one in which the insurer assumes the risk to pay damages to one obligating it to pay all sums whether damages or otherwise. To afford the word "damages" as employed in the insuring agreement the broad and literally boundless connotation that the majority would give it, the words, as used, become mere surplusage because any obligation to pay would be covered no matter how it arose or what it was intended to cover. *Maryland Casualty Co. v. Armco, Inc.*, 822 F.2d 1348, 1352 (4th Cir.1987), *cert. denied*, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988). I agree with the holding in *Continental Ins. Co. v. Northeastern Pharmaceutical & Chem. Co.*, 842 F.2d 977 (8th Cir.) (en banc), *cert. denied*, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) [hereinafter *NEPACCO*], as well as with the near unanimous holdings of the several United States Courts of Appeal which have considered the issue,[1] that even

---

1. As the majority opinion points out, our state statute is patterned after, and, insofar as this issue is concerned, is substantially identical to the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") 42 U.S.C. §§ 9601–9615. In addi-

tion to the holding by the Eighth Circuit in *NEPACCO*, the Fourth Circuit in *Cincinnati Ins. Co. v. Milliken & Co.*, 857 F.2d 979 (4th Cir. 1988); *Maryland Casualty Co. v. Armco, Inc.*, 822 F.2d 1348 (4th Cir.1987), *cert. denied*, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988);

though "damages" in the abstract may be considered to be an ambiguous term, when the word is inserted in a comprehensive liability insurance policy in the context of a sentence which defines the scope of the insurer's liability as one "to pay all sums which the insured shall become legally obligated to pay as damages * * * because of property damage * * * " it is no longer ambiguous. The plain meaning of the term as so employed refers to legal damages, and not to equitable-like remediation damages. Accordingly, I respectfully dissent.

By holding that the comprehensive general insurance policies here involved provide coverage to reimburse corporate polluters for response clean-up costs, some of which they more or less voluntarily assumed by agreement with the state without consent of the concerned insurers upon whom they now call for reimbursement, the majority opinion, it seems to me, disregards long established insurance policy language construction rules. These rules prohibit courts from reading ambiguity into the plain language of a policy simply in order to provide coverage. *See, e.g., Farkas v. Hartford Accident & Indem. Co.,* 285 Minn. 324, 327, 173 N.W.2d 21, 24 (1969), *Columbia Heights Motors, Inc. v. Allstate Ins. Co.,* 275 N.W.2d 32, 36 (Minn. 1979). In so doing, the majority finds ambiguity, not with reference to how the term "damages" is employed in the context of the policy language, but rather in reliance on abstract definitions of the term "damages" found in standard dictionaries. A valid argument could be advanced that such reference might be relevant to this construction issue had the insureds in these cases been lay persons, unsophisticated in the acquisition of liability insurance coverage, and had they been afforded liability coverage more or less on a "take it or leave it" basis under circumstances resulting in what might be considered to be a contract of adhesion. In my view, however, that

reference was inappropriate to the construction of the questioned phrase in the policies. No evidence exists that these policies were issued on a "take it or leave it" basis. From the limited evidence surrounding the execution of these policies, it clearly appears to me that it is much more probable that the policies in question were negotiated between large corporations, each of which had access to sophisticated insurance and legal departments or advice. I submit in such circumstances the invocation by the majority of the construction precept sometimes referred to as *contra preferentem,* that ambiguous language be construed against the insurer in accordance with the reasonable expectations of the insureds, is inapt. The fact of the matter is that when these policies were negotiated decades ago neither party had any idea that legislation similar to the superfund laws would impose such unlimited liabilities on polluters for remediation or clean-up costs; the risk was neither contemplated nor was its assumption by the insurers bargained for when the premium was set.

Long before the advent of superfund laws, property owners had tort liability for damages caused to others by activities conducted on their property. The insurance policies involved in these cases clearly contemplated shifting the property owners' risk for that type of damage to the insurers, and were that the issue in these three cases, I am sure unanimity would dictate the insurers bore the risk of paying those types of damages. Both the federal and state superfund laws contain provisions allowing recovery for that type of damage, *see* 42 U.S.C. § 9607(a)(4)(C) and Minn.Stat. § 115B.17, subd. 7 (1988), and both differentiate between such type of damage and remediation cleanup costs. *Compare, e.g.,* U.S.C. § 9606(a) and Minn.Stat. § 115B.17, subd. 6 (1988). But in these cases none of the plaintiffs are seeking indemnity or coverage for such type of damages. Rather

*Mraz v. Canadian Universal Ins. Co.,* 804 F.2d 1325 (4th Cir.1986); and the Fifth Circuit in *Aetna Casualty & Surety Ins. Co. v. Hanna,* 224 F.2d 499 (5th Cir.1955), many state courts have likewise addressed the issue. Although I am not certain that my research has included all of the

state cases, my census reveals that slightly more than half of the state courts have likewise concluded "response costs" are not "damages" within the meaning of the cited clause in comprehensive general liability insurance policies.

they seek response or remediation cleanup costs which have "no upper limit of liability." Brett, *Insuring Against the Innovative Liabilities and Remedies Created by Superfund*, 6 U.C.L.A. J. Envtl. L. & Pol'y 1, 53 (1986). As Professor Kenneth S. Abraham, wrote:

[T]o impose liability for cleanup expenses under policies issued before the enactment of the statutes that created such liability is to ignore the calculations that entered into the pricing of those policies, and thereby to ignore the underlying purpose of the provisions whose meaning is at issue. The result is twofold: a windfall for insureds, who receive benefits for which they never paid, and still another set of uncertainties regarding the magnitude of the liability an insurer providing environmental liability coverage may face.

Abraham, *Environmental Liability and the Limits of Insurance*, 88 Col.L.Rev. 942, 970 (1988).

Finally, I submit, the majority holding contravenes the public policy of the state to hold responsible polluters to the obligation to clean up the environmental damages they have caused by their activities, " * * * it is contrary to public policy to allow a responsible party to pass on the cost of clean up * * * to its insurance carrier, and thereby retain the benefit of having another perform its public duty without having paid for it." Brett, *Insuring Against the Innovative Remedies Created by Superfund*, 6 U.C.L.A. J. Envtl. L. & Pol'y 1, 52 (1986). As between the corporate polluters and their stockholders, and the policyholders of comprehensive general insurance policies, it seems to me the public policy of this state should place the onus of remediation upon the corporate polluters who have not paid for indemnification, rather than upon insurers who have not received a premium to cover its cost.

For these reasons, I would answer each of the certified questions in the negative.

COYNE, Justice (dissenting).

Because I, too, am of the view expressed by the majority of federal circuit courts

that a construction of the insuring agreements at issue would not afford coverage for remedial measures unilaterally undertaken by industry with neither notice to nor participation by the insurers, I respectfully dissent.

The insuring agreement in the comprehensive general liability insurance policies involved· in these cases obligates insurers "[t]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay *as damages* because of bodily injury or property damage to which the insurance applies," caused by an "occurrence" or, in the older policies, by an "accident." (Emphasis added). I agree with the view of Justice Kelley that the majority's construction of those insuring agreements completely ignores the *as damages* phrase and alters the entire meaning of the insuring agreement. The insurers agreed to undertake the risk of paying damages which the insured is legally obligated to pay, not to assume a broad and indefinable obligation to pay any and all sums, whether characterized as damages or otherwise. By refusing to apply the insuring agreement according to its terms, the majority has exceeded definitional limitations, ignoring the plain, ordinary and traditionally accepted meaning of the term "damages" as "only payments to third persons when those persons have a legal claim for damages * * *." *Aetna Casualty & Sur. Co. v. Hanna*, 224 F.2d 499, 503 (5th Cir.1955).

It is important to recognize that although both state and federal statutes differentiate between cleanup costs and damages, neither the MPCA nor the EPA sought damages from Minnesota Mining & Manufacturing Company or any of the other respondents here. This factor is important because the parties' obligations are controlled by the language of the insurance contract which is here written in terms of the relief sought, not in terms of the form of the cause of action. *See Maryland Cas. Co. v. Armco, Inc.*, 822 F.2d 1348, 1352–53 (4th Cir.1987). More simply, the contract refers specifically to "damages" which the insured is required to pay and not to other liabilities imposed on the insured by gov-

ernmental agencies during the course of negotiated remedial efforts. I share the wariness of the fourth circuit when it reasoned as follows:

[E]ven assuming that the costs to the defendant are the same regardless of whether the government sues for restitution or for damages, thus in some sense rendering the decision by the government regarding whether to sue for damages or restitution a "mere fortuity," it is a great step, and a dangerous one, for courts to begin to construe insurance policies to encompass costs of compliance with injunctive and reimbursement relief.

*Id.* at 1353. Therefore, while I find no critical distinction between the "legal" as opposed to "equitable" nature of proceedings, I am convinced that careful scrutiny of the insuring agreement requires a focus on the nature of the relief sought.

I am of the opinion that remediation or cleanup costs are more properly characterized as governmental obligations imposed to prevent or mitigate environmental pollution and incurred by industry either as a cost of doing business or as an economic loss associated with the business activity. The insureds here are directed to take prophylactic measures to assure that any pollution infecting specified property (often their own) not be allowed to escape from the confines to cause bodily injury or damage to the property of others. If those measures are inadequate and bodily injury or damage to the property of others occurs, the coverage language of the policy may well be applicable to any legal damages awarded third persons; and it seems to me only fitting that any applicable coverage not have been previously exhausted by expending it on a risk outside the policy coverage.

Finally, the majority casts its analysis in terms of the "reasonable expectations" of the parties, an inquiry apparently designed to construe yesterday's agreements and intentions by today's events. The analysis is flawed in two important respects. First, at the time these agreements were executed, there was perhaps little or no understanding of the potential substantial environmental harm from these business activities or any contemplation of protecting industry from costs associated with them. More significantly, it is difficult to accept a claim by these sophisticated parties that they "reasonably expected" coverage and then delayed for a period from four to eight years in informing their insurers of either the ongoing investigations and negotiations with the state to remedy or eliminate any environmental harm occasioned by their activities or their unilateral compliance with governmental cleanup directives. As a practical matter, the actions of the insureds are wholly inconsistent with their claim that coverage was contemplated.

In summary, I am troubled by the majority's efforts to shift the considerable cost burden from the industry whose intentional activities have sullied the environment to the insurer under the guise of a claimed ambiguity in the language of the insuring agreements. I further caution the majority that the cases are before this court on questions certified by the federal court and our consideration should be limited to an inquiry of whether cleanup costs are "damages" within the meaning of the comprehensive general liability policy. We are not asked to and cannot address questions such as whether there is property damage to which the policy applies, whether it was caused by an "occurrence" or an "accident" within the meaning of the policy or any matters relating to applicable statutes of limitation or the provision of notice by the insured to the insurer. The response to the questions certified is but one of a series of threshold questions, the accumulated responses to which will lead to the ultimate determination of whether coverage is available and our record is incomplete as to these other matters.

SIMONETT, Justice (dissenting).

I join in the dissents of Justice Kelley and Justice Coyne.