**The CITY OF MAPLE LAKE, Minnesota, Appellant,**

v.

**AMERICAN STATES INSURANCE COMPANY, as successor in interest to Western Casualty and Surety Insurance Company, The Home Insurance Company, Continental Western Insurance Company, Respondents.**

No. C8–93–831.

Court of Appeals of Minnesota.

Dec. 7, 1993.

Review Denied Feb. 24, 1994.

Scott A. Smith, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, for appellant.

John M. Anderson, Bassford, Heckt, Lockhart, Truesdell & Briggs, P.A., Minneapolis, for American States Ins. Co., as successor in interest to Western Cas. and Surety Ins. Co., respondent.

Cynthia M. Hazelwood, Bruce G. Jones, Faegre & Benson, Minneapolis, for Home Ins. Co., respondent.

Thomas O. Albers, Courey, Schwinn, Kodadek & Albers, P.A., Minneapolis, for Continental Western Ins. Co., respondent.

Considered and decided by NORTON, P.J., and SHORT and STONE,* JJ.

## OPINION

NORTON, Judge.

Appellant City of Maple Lake challenges the district court's determination that its policies of insurance do not afford coverage. We affirm.

## FACTS

In the early 1960s, the City of Maple Lake replaced its wastewater treatment plant (WWTP). The existing facility had discharged effluent into Ramsey Lake, a lake with considerable recreational value. The effluent discharge, in the opinion of the Minnesota Department of Health, was rendering Ramsey Lake unfit for development.

To avoid continued degradation of Ramsey Lake, the city, in conjunction with the Department of Health, decided to discharge the effluent from the new WWTP into Mud Lake, a shallow lake considered to have minimal recreational value. Agricultural runoff made Mud Lake eutrophic most of the year and hypertrophic in the late summer.[1] Since 1965, the new WWTP has discharged its effluent into Mud Lake.

Mud Lake and Maple Lake were once one lake. After Maple Lake was divided into North and South Maple Lake, South Maple Lake came to be known as Mud Lake. Mud Lake and Maple Lake were then connected by a culvert; this culvert was closed in 1971, however, allegedly by the city without permission of the Department of Natural Resources.

In 1966, Melvyn and Dorothy Stuhr purchased property on Mud Lake. In 1973, the Stuhrs entered into a contract for deed for the purchase of a second lot on Mud Lake. In 1983, Tim and Aimee Kittock purchased property on Mud Lake from the Stuhrs.

Following closure of the culvert between Mud Lake and Maple Lake, the Stuhrs noticed a marked decline in the quality of Mud Lake. The Stuhrs observed a massive fish kill in Mud Lake, and they allege no fish have lived in Mud Lake since then. By 1971, the Stuhrs had become convinced that the city's operation of its WWTP was the cause of Mud Lake's deterioration.

In 1987, the Stuhrs submitted a notice of claim, pursuant to Minn.Stat. § 466.05 (1986), asserting the city's operation of its WWTP had damaged the Stuhrs. In 1990, the Stuhrs petitioned the Wright County District Court for a writ of mandamus, seeking to compel the city to commence condemnation proceedings for its taking of their property. The district court issued the writ of mandamus. Subsequently, the Kittocks were granted leave to join in the Stuhrs' mandamus action. For simplicity, the Kittocks and the Stuhrs will be referred to collectively as the Stuhrs. In their amended petition for a writ of mandamus, the Stuhrs alleged that they,

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

1. A eutrophic lake is one which is rich in nutrients favoring plant life over animal life. The American Heritage Dictionary 469 (2nd College Ed.1982). A hypertrophic lake is one characterized by excessive plant growth. 1 Oxford English Dictionary 1360 (Compact Ed.Reissue 1987).

[A]s owners of land which abuts and is submerged under [Mud Lake], have suffered trespass and damage to their land and riparian rights, have suffered a definite and measurable decrease in the value of their property, and have suffered substantial interferences with the current practical enjoyment of the property.

The city advised its insurers that the Stuhrs had brought a lawsuit seeking to institute an inverse condemnation claim against the city.

Respondent insurers issued comprehensive general liability insurance policies to the city covering the period from 1973 through 1985. Continental Western Insurance Company (Continental Western) issued four successive one-year policies, covering the period from May 1973 through May 1977. American States Insurance Company's predecessor, Western Casualty and Surety Insurance Company (Western Casualty), issued four policies covering the period from November 1977 through November 1981. The Home Insurance Company (The Home) issued two policies, covering the period from November 1981 to November 1985. All of the city's policies stated the insurers would defend and indemnify the city in any suit seeking damages for personal injury or property damage.

The policies issued by Continental Western and Western Casualty between 1973 and 1984 contained a qualified pollution exclusion, which provided:

This insurance does not apply:

\*     \*     \*     \*     \*     \*

(f) to \* \* \* property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

The policy issued by The Home, which covered the period from 1984 through 1985, contains an absolute pollution exclusion, which precludes coverage for

property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water.

The district court granted the insurers' motion for summary judgment. The court concluded the Stuhrs were not seeking damages in their action against the city. In addition, the court determined the policies' pollution exclusions barred coverage for claims arising out of the city's discharge of effluent from the WWTP.[2] The city has appealed.

### ISSUES

I. Did the district court err in determining that the Stuhrs' mandamus action against the city is not a claim for "damages"?

II. Did the district court err in holding that the pollution exclusion clauses in the city's insurance policies apply to the claims against the city?

### ANALYSIS

#### Standard of Review

■ The standard of review of a summary judgment is well established. In reviewing a summary judgment, this court must determine whether any genuine issues of material fact exist and whether the district court correctly applied the law. *Offerdahl v. University of Minn. Hosps. & Clinics,* 426 N.W.2d 425, 427 (Minn.1988). On appeal, this court must view the evidence in the light most favorable to the party against whom summary judgment was granted. *Grondahl v. Bulluck,* 318 N.W.2d 240, 242 (Minn.1982). Interpretation of insurance policy language presents a question of law which this court reviews de novo on appeal. *Iowa Kemper Ins. Co. v. Stone,* 269 N.W.2d 885, 887 (Minn. 1978).

---

**2.** We will not address the other grounds on which the district court based its grant of summary judgment in light of our disposition of this case.

In the present case, the city is asserting a right to a defense from its insurers for the claims brought by the Stuhrs. The duty to defend under an insurance policy is broader than the duty to indemnify the insured for any judgment. *Brown v. State Automobile & Cas. Underwriters*, 293 N.W.2d 822, 825 (Minn.1980). The insurer must defend the insured if any part of the cause of action is arguably within the scope of the policy's coverage. *Johnson v. Aid Ins. Co.*, 287 N.W.2d 663, 665 (Minn.1980).

### I. *Damages*

The Stuhrs seek a writ of mandamus to compel the city to initiate condemnation proceedings. An action for mandamus is not a suit "seeking damages" as required in a liability insurance policy. *City of Thief River Falls v. United Fire & Cas. Co.*, 336 N.W.2d 274, 276 (Minn.1983). In *Thief River Falls*, the insured city installed traffic control signals at a T intersection and eliminated adjacent on-street parking. The owner of a convenience store at the top of the T sued the city, claiming the city's action in eliminating on-street parking was a taking of the store owner's easement of ingress and egress. *Id.* at 275. In determining the city's insurer was not obligated to pay for the costs of defense, the court stated:

> We think it obvious that *the essence of mandamus is to secure performance of a legally required act.* An award of damages is merely ancillary to this primary relief. We conclude, therefore, that the policy term "suit * * * seeking damages" unambiguously does not include actions for mandamus generally.

> Nor are we convinced that the nature of the act sought to be compelled in the present case should qualify the store owners' suit as one "seeking damages." The store owners sought to mandate initiation of condemnation proceedings pursuant to Minn. Stat. Ch. 117 (1982) alleging a constitutional "taking" of their right of access to the public street. Although Chapter 117 refers to condemnation awards as "damages" they are, in essence, compensation for rights purchased by the condemning authority. The policy language at issue here

clearly was not intended to cover situations where the City acquired something of equal value to the "damage" inflicted.

*Id.* at 276 (emphasis added).

The city contends *Thief River Falls* has been virtually overruled by the subsequent decision of the Minnesota Supreme Court in *Minnesota Mining & Mfg. Co. v. Travelers Indemnity Co.*, 457 N.W.2d 175 (Minn.1990) *(3M)*. We disagree.

At issue in *3M* was whether clean-up costs mandated by the Minnesota Pollution Control Agency constituted "damages because of * * * property damage" within the meaning of comprehensive general liability insurance policies. *Id.* at 177. The insurers in *3M* argued that their policies did not cover expenditures made to comply with the equitable injunctive orders issued by the MPCA. *Id.* at 178. The court rejected the insurers' argument that "damages" required a distinction between legal and equitable relief. *Id.* at 179. In doing so, the court distinguished *Thief River Falls*, stating:

> Our holding in *[Thief River Falls]* does not compel us to recognize an unambiguous technical distinction between legal and equitable claims in the term "damages." * * * *Thief River Falls* is not controlling in these cases, because we are presented with different types of claims asserted against the insureds and different sets of expectations by the insurers and the insureds. Unlike *Thief River Falls*, property damage has occurred in these cases which has given rise to claims against the insureds that require them to pay amounts to reimburse the MPCA and to make out-of-pocket expenditures to pay contractors or their own employees *to restore property to its prepolluted condition.* In *Thief River Falls*, the claim against the insured required only that the insured city commence condemnation proceedings. Moreover, *even if the city eventually was required to pay money in the form of a condemnation award, that was merely an exchange of money for property of equal value and was not made to compensate the claimant for injury to property.*

*Id.* (emphasis added). The distinction between *3M* and *Thief River Falls* is in the

relief sought. In *3M*, the insureds were sued for the cost of restoring property that they had damaged. *Id.* In *Thief River Falls*, the claimant sought compensation for property that the insured city had allegedly taken. *Id.*

The term "damages" refers to compensation for an injury caused by a violation of a legal right. *Id.* at 182. Whether the relief sought is legal or equitable does not alter the meaning of the word. *Id.* at 179.

The city contends *3M* requires a finding of coverage for any economic outlay compelled by law to rectify or mitigate damage caused by the insured's acts or omissions. *Id.* at 181–82. The claim against the city, however, is not for property damage. In contrast to *3M*, the Stuhrs are not demanding that the city restore their property to its prepolluted condition. In fact, the prospects of restoration are virtually nonexistent. The MPCA has estimated that clean-up of the lake alone would cost between $3 and $10 million. The Stuhrs seek to compel the city to condemn and pay reimbursement for property taken.

In discussing common law remedies, the court in *3M* noted:

[T]he costs of restoring property to its original condition has [sic] been a long-recognized measure of damages in common law pollution cases. Under the common law, damages of this kind are typically limited to the diminution in the value of the damaged property if the cost of restoring the property to its original condition would exceed that value.

*Id.* at 183. Had the Stuhrs sought damages for the diminution in value of their property, the claim would have been one for damages. By petitioning for mandamus to compel the city to perform a legally required action, the Stuhrs have not sought damages. *Thief River Falls*, 336 N.W.2d at 276.

The city argues that the Stuhrs could have brought a tort claim as a result of the city's actions. But in any taking claim, the possibility will exist that the claim could have been cast in terms of trespass or nuisance. *See Alevizos v. Metropolitan Airports Comm'n of Minneapolis & St. Paul*, 298 Minn. 471, 483–84 n. 1, 216 N.W.2d 651, 660 n. 1 (1974). The existence of possible alternate theories of liability does not alter the fact that the Stuhrs brought a claim for a writ of mandamus. Furthermore, the Stuhrs were concerned that the applicable statute of limitations would bar their suit for damages. *See Fagerlie v. City of Willmar*, 435 N.W.2d 641, 643–44 (Minn.App.1989) (establishing applicable statute of limitations for negligence or nuisance in similar factual setting). The Stuhrs were not obligated to select a tort theory that would fall within the city's insurance coverage when recovery on that theory is doubtful.

The economic outlay required by an inverse condemnation action is an exchange of value for value. The city, having acquired an interest in property, is being required by the prior owner of the property interest to pay for that interest. In essence, the Stuhrs are claiming that the city has already received something of value from the Stuhrs, and the Stuhrs want to be paid for what the city has received. The Stuhrs' claim is not one for damages, and the insurance policies do not provide coverage.

## II. *Pollution Exclusion*

Even if the Stuhrs' claim were one for damages, the policies' pollution exclusions would bar coverage. All of the policies at issue in the present case contain pollution exclusions. The policies issued between 1973 and 1981 contain exclusions with an exception for sudden and accidental releases of pollutants; the policies issued between 1981 and 1985 contain absolute exclusions.

The city contends the district court erred in determining the WWTP effluent constitutes a "pollutant." Any liquid waste that contaminates water is a pollutant. *See* The American Heritage Dictionary 960 (2nd College Ed.1982). As the city notes, the WWTP takes in wastewater, treats it to MPCA standards, and discharges the treated wastewater into Mud Lake. The fact that the wastewater is treated does not mean that it is not a pollutant. The harmful effect of the wastewater is simply minimized to the extent possible before the effluent is discharged into Mud Lake. It bears repeating that Mud Lake was selected as the discharge site be-

cause of the harmful effects the effluent was expected to have on a lake of greater recreational value. The WWTP effluent is a pollutant as that term is generally understood.

## A. Qualified Exclusion

This court has determined that the word "sudden," as used in the sudden and accidental exception to the pollution exclusion, is unambiguous and has a temporal connotation, requiring that

the incident at issue occurs relatively quickly rather than gradually over a long period of time.

*Sylvester Bros. Dev. Co. v. Great Central Ins. Co.*, 480 N.W.2d 368, 375 (Minn.App.1992), *pet. for rev. denied* (Minn. Mar. 26, 1992).[3] In reaching this conclusion, the *Sylvester Bros.* court stated:

The operator contends our decision in *Grinnell Mut. Reins. Co. v. Wasmuth*, 432 N.W.2d 495 (Minn.App.1988), *pet. for rev. denied* (Minn. Feb. 10, 1989) requires a finding that the "sudden and accidental" exception is ambiguous. We disagree. The principal basis for our decision in *Grinnell* was the "reasonable expectations" doctrine. *Id.* at 499. This court repeatedly emphasized the unique facts in *Grinnell* as being the basis for its conclusion. Rather than support a finding of ambiguity, *Grinnell* supports our conclusion that "sudden and accidental" is unambiguous because this is precisely the type of "typical" pollution case in which *Grinnell* found the scope of the pollution exclusion clause to be unambiguous. *Id.* at 498–500.

*Id.* at 376. The city contends that *Grinnell* and *Sylvester Bros.*, taken together, limit the applicability of the "sudden and accidental" exclusion to "typical pollution" claims. As this court noted in *Sylvester Bros.*, however, the basis for the holding in *Grinnell* was the reasonable expectations doctrine. *Id.*

Despite the *Grinnell* court's reliance on the reasonable expectations doctrine to find coverage, the city contends the *Grinnell* court established a five-factor test to determine whether a case presents a "typical pol-

lution" claim. *See Grinnell*, 432 N.W.2d at 498. The five factors referred to in *Grinnell* formed part of the basis for determining that the reasonable expectations doctrine applied. They do not constitute a "test."

The city contends it had a reasonable expectation of coverage and, as in *Grinnell*, its reasonable expectation should be honored. We disagree. The doctrine of reasonable expectations was applied in *Grinnell* because of the unique and compelling facts of the case. This case does not present a comparable factual situation.

■ Applying the exclusion to this case, we hold there is no coverage because the discharge of pollutants was not sudden and accidental. The city has been dumping WWTP effluent into Mud Lake for over 30 years. This cannot reasonably be construed as "sudden."

■ In addition, the city made a conscious decision to dump effluent into Mud Lake. This conscious decision was "the antithesis of an accident." *See Sage Co. v. Insurance Co. of N. Am.*, 480 N.W.2d 695, 698 (Minn.App.1992) (intentional discharge of employee).

The city decided to place the WWTP's effluent into Mud Lake in order to protect Maple Lake and Ramsey Lake, two lakes which were deemed to be more desirable and worthy of protection. Over the years, the city has attempted to keep the water of Mud Lake separate from Maple Lake in order to avoid harm to Maple Lake. The city's closure of the culvert between the lakes was apparently an attempt to control flow between the two lakes. Since the city made the decision to move the effluent discharge from Ramsey Lake to Mud Lake in order to prevent pollution of Ramsey Lake, the release of pollutants into Mud Lake was anything but accidental.

## B. Absolute Exclusion

■ Unlike the "sudden and accidental" exclusion, the pollution exclusion in The

---

3. This court has recently affirmed the district court's conclusion on remand in *Sylvester Bros.* that the release in that case was not sudden as a matter of law. *Sylvester Bros. Dev. Co. v. Great Central Ins. Co.*, 503 N.W.2d 793 (Minn.App. 1993), *pet. for rev. denied* (Minn. Sept. 30, 1993).

Home policies issued between 1981 and 1985 bars coverage for bodily injury or property damage arising out of *any* polluting activity. The city, relying on *Grinnell,* contends that its reasonable expectations override the terms of the absolute pollution exclusions. The basis of the *Grinnell* decision, however, was the unique fact situation of the case. *Grinnell* should be limited to its facts, rather than extended to the present case.

The absolute exclusion is unambiguous. *See Sylvester Bros.,* 480 N.W.2d at 374; *League of Minn. Cities Ins. Trust v. City of Coon Rapids,* 446 N.W.2d 419, 422 (Minn. App.1989), *pet. for rev. denied* (Minn. Dec. 15, 1989); *see also Bureau of Engraving v. Federal Ins. Co.,* 793 F.Supp. 209, 212 (D.Minn.1992), *aff'd on other grounds,* 5 F.3d 1175 (8th Cir.1993). The absolute exclusion in the present case precludes coverage for the Stuhrs' claims.

## DECISION

The Stuhrs' claim against the city is not one for damages, and the city's policies afford no coverage. Even if the claim were for damages, the policies' pollution exclusions would bar coverage.

Affirmed.