FAIRVIEW HOSPITAL AND HEALTH
CARE SERVICES, Appellant,

v.

ST. PAUL FIRE & MARINE
INSURANCE COMPANY,
Respondent.

No. C9–93–2524.

Court of Appeals of Minnesota.

June 14, 1994.

Review Granted Sept. 16, 1994.

Maclay R. Hyde, Alan T. Held, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, for appellant.

Charles E. Spevacek, Stacy A. Broman, Meagher & Geer, Minneapolis, for respondent.

Considered and decided by LANSING, P.J., and FORSBERG and DAVIES, JJ.

## OPINION

LANSING, Judge.

In a declaratory judgment action, a hospital seeks indemnity and defense from its insurer for environmental response costs. The district court granted summary judgment for the insurer. We conclude that although the district court acted within its discretion in excluding the affidavit of one of the expert witnesses, other evidence is sufficient to create a triable issue of fact on whether property damage occurred during the policy period. We also conclude that the

policy's concurrent insurance provisions do not bar coverage.

## FACTS

Fairview Hospital and Health Care Services is potentially liable for response costs under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601–9675 (CERCLA) and the Minnesota Environmental Response and Liability Act, Minn.Stat. §§ 115B.01–115B.37 (MERLA). St. Paul Fire and Marine Insurance Company provided comprehensive hospital liability (CHL) insurance policies to Fairview from May 9, 1966, to May 9, 1972, and provided umbrella excess liability policies to Fairview from May 9, 1970, to May 9, 1972. Under the CHL insurance policies, St. Paul agreed:

> To pay on the behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident.

For policy periods May 9, 1968 to May 9, 1972, the policies provide that, wherever the word "accident" appears in the endorsement, it should be replaced by "occurrence." The policies define occurrence as "an accident, including injurious exposure to conditions, which results during the policy period in property damage * * *." The policies define property damage as "injury to or destruction of tangible property."

Most of the policies St. Paul issued to Fairview did not contain pollution exclusion clauses, although the 1971–1972 CHL and umbrella policies apparently did. Since the end of the St. Paul policy periods, only one other insurer provided coverage without a pollution exclusion provision. This company, Associated Medical Assurance (AMA), provided coverage from May 9, 1976, to November 30, 1977.

Fairview used Nelson Trucking Service to dispose of some of its waste from 1962 to 1974. Fairview's wastes included the hazardous substance xylene, a volatile organic compound (VOC). Nelson Trucking disposed of waste at the East Bethel and Oak Grove landfills. In 1982 VOCs were found in groundwater samples taken from the East Bethel site. A 1992 administrative record of decision stated that groundwater beneath the East Bethel site had been contaminated by leachate discharged from landfill wastes. Groundwater contamination at the Oak Grove site was discovered in 1984.

In the mid–1980s, both the East Bethel and Oak Grove sites were listed on state and federal hazardous waste lists. In July 1987, the Minnesota Pollution Control Agency notified Fairview that it was potentially responsible for releases of hazardous substances at the East Bethel site. Fairview was sued by a private party for contribution toward environmental response costs for East Bethel on March 7, 1990. In March 1991 the Environmental Protection Agency notified Fairview it was potentially responsible for releases at the Oak Grove site. Fairview gave St. Paul timely notice of its potential liability for response costs at both sites. St. Paul denied coverage.

## ISSUES

I. Do genuine issues of material fact exist on whether there was property damage during the St. Paul policy periods?

II. Did the district court err in finding that St. Paul's "concurrent insurance" provisions precluded coverage under the policies?

## ANALYSIS

### I

■ Minnesota applies the actual injury rule to determine when damage or injury occurs from long-term exposure to chemicals. *Industrial Steel Container v. Fireman's Fund Ins.*, 399 N.W.2d 156, 159 (Minn.App.), *pet. for rev. denied* (Minn. Mar. 18, 1987); *see also Minnesota Mining & Mfg. v. Travelers Indem.*, 457 N.W.2d 175, 183 (Minn.1990) (injury to the environment occurs when groundwater is damaged). Under the actual injury rule, property damage occurs at " 'the time the complaining party was actually damaged.' " *Industrial Steel*, 399 N.W.2d at 159 (quoting *Singsaas v. Diederich*, 307 Minn. 153, 156, 238 N.W.2d 878, 880 (1976)); *see also Krawczewski v. Western Casualty and*

*Sur.,* 506 N.W.2d 656, 659 (Minn.App.) (injury-in-fact triggering coverage occurs with release of contaminants into groundwater), *pet. for rev. denied* (Minn. Nov. 23, 1993).

St. Paul urges us to apply a manifestation of injury rule instead of the actual injury rule. We are not persuaded by the authority cited or the rationale used for their argument. Under a manifestation of injury rule, policies are triggered at the time injury manifests itself, rather than at the time injury occurs. *See Eagle-Picher Indus. v. Liberty Mut. Ins.,* 682 F.2d 12, 19–20 (1st Cir. 1982), *cert. denied,* 460 U.S. 1028, 103 S.Ct. 1279, 1280, 75 L.Ed.2d 500 (1983). A manifestation of injury rule is more consistent with claims made policies than occurrence policies. Claims made policies provide coverage for claims first made during the life of a policy. *St. Paul Fire & Marine Ins. v. Barry,* 438 U.S. 531, 535 n. 3, 98 S.Ct. 2923, 2926 n. 3, 57 L.Ed.2d 932 (1978). Occurrence policies, however, protect a policyholder from liability for any act done while the policy was in effect. *Id.* The St. Paul CHL insurance policies are occurrence policies providing coverage for occurrences, "which result[ ] during the policy period in property damage * * *." The language of the policies, in defining coverage as damage during the policy period, imposes an actual injury rule.

Under the actual injury rule, the fact that contamination is not discovered until years after a policy is in force does not defeat an insured's attempt to obtain coverage. *See SCSC Corp. v. Allied Mut. Ins.,* 515 N.W.2d 588, 592–593, 596 (Minn.App.1994) (coverage existed for occurrence during policy period even though contamination was not discovered until a decade later). The triggering event for coverage is the actual damage, such as contamination of groundwater or soil during a policy period. *Northern States Power v. Fidelity & Casualty,* 504 N.W.2d 240, 245 (Minn.App.), *pet. for rev. granted in part, denied in part* (Minn. Nov. 16, 1993); *Industrial Steel,* 399 N.W.2d at 159; *see also Centennial Ins. v. Lumbermens Mut. Casualty,* 677 F.Supp. 342, 346 (E.D.Pa.1987) (applying actual injury rule and holding that each time wastes were released, there was an injurious effect triggering coverage); *Fireman's Fund*

*Ins. v. Ex–Cell–O Corp.,* 662 F.Supp. 71, 76 (E.D.Mich.1987) (each exposure of the environment to a pollutant constitutes an occurrence and triggers coverage).

St. Paul argues that Fairview cannot show damage during the policy periods that would trigger coverage. In its motion for summary judgment, St. Paul introduced evidence stating that the sites were not contaminated in 1972 and 1978. St. Paul also argued that Fairview's experts themselves indicated that they could not pinpoint the level of VOCs in the groundwater at the time of St. Paul's last policy periods.

When reviewing a grant of summary judgment, we do not weigh the credibility of the evidence. Minn.R.Civ.P. 52.01. Rather, we determine whether specific facts exist that create a genuine issue for trial. Minn. R.Civ.P. 56.03; *Hunt v. IBM Mid Am. Employees Fed. Credit Union,* 384 N.W.2d 853, 855 (Minn.1986). In doing so, we take a view of the evidence most favorable to the one against whom summary judgment was granted. *Offerdahl v. University of Minn. Hosp. & Clinics,* 426 N.W.2d 425, 427 (Minn.1988).

Although the VOC contamination in this case was not discovered until the 1980s when testing for VOC contamination took place, Dr. Robert S. Guthrie, one of Fairview's experts, concluded that groundwater beneath East Bethel and Oak Grove was first contaminated in the late 1960s. He stated that the groundwater would have been affected soon after the waste was deposited at the sites. His opinion was based on the water soluble and mobile nature of VOCs, the proximity of VOCs to groundwater, the porous soils and lack of leachate protection systems at the sites, and rainfall during relevant time periods. This type of scientific testimony is probative in determining when damage occurred. *See SCSC Corp.,* 515 N.W.2d at 594 (noting the testimony of a hydrogeologist who relied on knowledge of a site, its soil, the hazardous substance at issue, and backdating to determine the point at which contamination occurred). Fairview has set forth sufficient facts to withstand summary judgment on the issue of whether there was damage during the policy periods.

The district court also concluded that Fairview failed to show its hazardous wastes went to the sites. Although Fairview was unable to present clear evidence documenting waste disposal, Fairview admitted placing some hazardous waste containers in the waste that was picked up by Nelson Trucking Service and deposited at the sites. Gerald Nelson of Nelson Trucking gave deposition testimony that he picked up five dumpsters of waste from Fairview every day, which leaked "clear stuff, strong-smelling stuff," with an "acid-type smell." Fairview's wastes included the hazardous substance, xylene, a VOC, and VOCs were found at the sites. A genuine issue of material fact also exists on whether Fairview sent wastes to the sites.

On appeal St. Paul renews its additional argument that, because no property damage occurred during the St. Paul policy periods for which Fairview would have been legally obligated to pay damages, Fairview cannot show its expenditures are causally related to damages within the policy periods.

The St. Paul policies stated that St. Paul would pay "all sums which the Insured shall become legally obligated to pay * * *." Response costs are sums an insured becomes legally obligated to pay within the meaning of comprehensive liability policies. *Minnesota Mining*, 457 N.W.2d at 182. If Fairview can demonstrate that damage existed during the policy periods and response costs were later necessary to respond to the damage, the St. Paul policies are actuated. *See Northern States Power*, 504 N.W.2d at 245 (costs and expenses necessary to clean up pollution already present are covered by general liability policies); *cf. Minnesota Mining*, 457 N.W.2d at 184 (coverage does not exist for "[p]urely preventative measures").

In addressing these issues, the district court did not specifically address St. Paul's duty to defend. Fairview raised this issue in its complaint and argued it in the district court. The policies provided to Fairview by St. Paul stated that St. Paul would defend any suit against the insured alleging "damages, even if such suit is groundless, false or fraudulent * * *." An insurer's obligation to defend is contractual in nature, and if "any part of a cause of action is arguably within the scope of coverage, the insurer must defend." *Prahm v. Rupp Constr.*, 277 N.W.2d 389, 390 (Minn.1979); *see also Brown v. State Auto. & Casualty Underwriters*, 293 N.W.2d 822, 825–26 (Minn.1980) (the duty to defend is broader than the duty to indemnify). On remand the district court should separately address St. Paul's duty to defend.

## II

St. Paul argues that the concurrent insurance provisions in its policies bar coverage because another insurer, American Medical Association (AMA), provided coverage that applies to the same loss and exceeds the policy limits of St. Paul's policies. The district court determined that summary judgment for St. Paul was independently appropriate on this ground.

St. Paul provided comprehensive liability coverage from May 9, 1966, to May 9, 1972 and umbrella excess liability coverage from May 9, 1970, to May 9, 1972. AMA provided comprehensive liability coverage from May 9, 1976, to November 30, 1977.

The interpretation of an insurance contract is a question of law that this court reviews de novo. *Garrick v. Northland Ins.*, 469 N.W.2d 709, 711 (Minn.1991). An examination of the St. Paul policies shows that the AMA policies do not apply to the coverage periods under the St. Paul policies. The "concurrent insurance" provisions in the St. Paul policies apply only when an insured party carries a concurrent policy "against any loss covered by [St. Paul's] policy * * *." *Cf. Northern States Power*, 504 N.W.2d at 244 (construing "other insurance" provisions).

St. Paul's policies also specifically limit coverage to occurrences *during* the policy period. A plain reading of the St. Paul policies indicates that the only time the policies of another insurer must be construed with the St. Paul policies is when those policies also cover an occurrence within the same policy period; that is, when both insurers are concurrently on the risk within the same policy period. *See Orren v. Phoenix Ins.*,

288 Minn. 225, 228, 179 N.W.2d 166, 169 (1970) (in the absence of ambiguity, courts should give contracts of insurance their plain, ordinary meaning). The St. Paul policies provide coverage for the loss occurring during the St. Paul policy periods and are not concurrent with AMA's coverage.

### III

 Fairview argues that the district court erred in refusing to consider the affidavit of Dr. Roy O. Ball, an expert whose testimony was offered to rebut testimony of St. Paul's expert. Fairview's disclosure of Ball came after the deadline for disclosure of names and opinions of expert witnesses. In refusing to consider Ball's affidavit, the court noted that it was not considering the affidavit because it was untimely, because Ball was not deposed, and because no discovery was conducted with respect to Ball's testimony. The district court did not abuse its discretion in refusing to consider Ball's affidavit. *See Freeburg v. Lillydale Grand Cent. Corp.*, 284 Minn. 388, 393, 170 N.W.2d 330, 334 (1969).

### IV

Fairview moved to submit for the record on appeal materials related to the East Bethel and Oak Grove response cost recovery suits pending in federal district court. These materials were not before the district court. St. Paul moves to strike this material and all references to the material in Fairview's brief, as well as an additional sentence in Fairview's brief that St. Paul claims is otherwise unsupported by the record.

Fairview offers the additional evidence for the purpose of reversing the district court. This court will not consider evidence, even of a documentary nature, for the purpose of reversing a district court. *Plowman v. Copeland, Buhl & Co.*, 261 N.W.2d 581, 584 (1977). The material is stricken.

### DECISION

We reverse and remand the grant of summary judgment because a genuine issue of material fact exists on whether damage occurred during the St. Paul policy periods. We reverse the district court's determination that the concurrent insurance provisions in St. Paul's policies, when construed with another insurer's policies, precluded coverage under the St. Paul policies. We remand to allow the district court to consider St. Paul's duty to defend. We affirm the district court's evidentiary ruling excluding consideration of the affidavit of an expert witness.

**Affirmed in part, reversed in part, and remanded.**