GOPHER OIL COMPANY, Respondent,

v.

AMERICAN HARDWARE MUTUAL INSURANCE COMPANY, Appellant.

No. C1–98–737.

Court of Appeals of Minnesota.

Feb. 2, 1999.

Keith J. Broady, Steven R. Hedges, Timothy C. Matson, Abdo & Abdo, P.A., Minneapolis, for respondent.

Robert S. Metcalf, Mark Scholle, Scholle, Beisel & Metcalf, Ltd., Minneapolis, for appellant.

Considered and decided by SHORT, Presiding Judge, LANSING, Judge, and RANDALL, Judge.

## O P I N I O N

LANSING, Judge

A successor oil-distributing corporation, through a declaratory judgment action, seeks indemnification and defense from its predecessor's insurer for environmental liabilities stemming from the predecessor's activities at four sites. We conclude that the district court did not abuse its discretion or reversibly err in finding coverage, granting partial summary judgment excluding one site, directing a verdict that actual injury occurred at one site, instructing the jury, ruling on evidentiary objections, or ordering indemnification and defense costs. The district court's findings and the jury's verdict are supported by the evidence, and we affirm.

## FACTS

Gopher Oil Company (Gopher) has been found liable and is potentially liable for environmental cleanup costs under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601–9675 (1994) (CERCLA), and the Minnesota Environmental Response and Liability Act, Minn.Stat. §§ 115B.01–.241 (1996) (MERLA), for the activities of its predecessor corporation, Gopher State Oil Company (Gopher State). Gopher State was a wholesale distributor of oil and lubricating products and, until June 1971, it re-refined used motor oil. A by-product of the re-refining process was oil sludge, which Gopher State disposed of at a number of dump sites. The four sites involved in this litigation are Arrowhead, Bellaire, Brooklyn Park, and Oak Grove.

From January 1954 through October 1973, Gopher State purchased commercial general liability (CGL) policies from American Hardware Insurance Company. In July 1972, Gopher State purchased a three-year CGL policy and a three-year commercial umbrella policy from American Hardware. American Hardware was aware that Gopher State re-refined waste oil as part of its operations. Beginning in July 1972, the CGL policy contained a pollution exclusion endorsement, the UL–21 endorsement, that limited coverage for property damage from pollution to sudden and accidental occurrences. The district court found the commercial umbrella policy also contained the UL–21 endorsement as of July 1972. The policies were renewed in July 1975 and cancelled by Gopher on January 1, 1976.

Charles Romness, one of the owners of Gopher State, was also an owner of Arrowhead Refining Company from 1961 to 1976. Arrowhead Refining, insured under a policy issued by a different insurer, disposed of oil sludge from its re-refining process on its property (the Arrowhead site) in a wetland referred to as the "sludge lagoon." The Minnesota Pollution Control Agency (MPCA) closed Arrowhead Refining at the end of 1976.

In October 1973, Bame Oil Corporation, owned by Fred Bame, purchased Gopher State. Subsequently, Bame Oil took Gopher as its corporate name. American Hardware's policies remained in effect, unaltered, throughout this period, despite its knowledge of the change in ownership. Gopher renewed its policies with American Hardware through the end of 1975. In 1981, eight years after his purchase of Gopher State, Bame and another corporation, Gopher Rubber Cote, purchased the Arrowhead site.

Beginning in 1991, Gopher received four claims that alleged it was liable for environmental contamination due to Gopher State's activities. The claims alleged Gopher State was a source of contaminants for, and operator of, the Arrowhead site, that Gopher State disposed of oil sludge in the 1950s and 1960s at the Bellaire and Brooklyn Park dump sites, and that Gopher was a source of contaminants disposed of at the Oak Grove dump site. American Hardware denied Gopher's tenders of defense on all four claims.

The Environmental Protection Agency (EPA) brought an enforcement action against Gopher, alleging it was jointly and severally liable for investigation and cleanup of the Arrowhead site. The estimated clean-up cost for the site was in excess of $38 million. In April 1994, Gopher agreed to pay $1,225,000 to settle the Arrowhead claim. The settlement also covered the United States' claims against Bame and Gopher Rubber Cote. American Hardware refused to participate in

the settlement negotiations on behalf of Gopher.

In the Bellaire claim, the MPCA ordered Bellaire Sanitation to remove soil contaminated by oil sludge from the site. The cleanup cost was $330,421.72. Bellaire Sanitation sued Gopher, alleging Gopher State disposed of oil sludge at the site in 1966 and 1967. Gopher defended itself against the claim, and a jury found it liable for one-half of the cleanup costs.

In the Brooklyn Park claim, the EPA made a demand on Gopher to pay for cleanup costs at the site. The claim alleged Gopher State had disposed of oil sludge at the site in the 1950s and 1960s and that Gopher's share of the cleanup cost was in excess of $1.3 million. Gopher disputed the claim, and the record does not indicate that the litigation has been concluded. The EPA also made a demand on Gopher to pay for cleanup costs at the Oak Grove site.

In October 1994, Gopher brought this declaratory action against American Hardware. The district court held that American Hardware had a duty to defend Gopher based on its predecessor's policies. This court dismissed American Hardware's appeals from the district court's ruling as premature, *Gopher Oil Co. v. American Hardware Mut. Ins. Co.*, Nos. C5–96–1658, C5–96–1689 (Minn.App. Aug. 27, 1996) (order opinion); *Gopher Oil Co. v. American Hardware Mut. Ins. Co.*, No. C9–96–2022 (Minn.App. Oct. 29, 1996) (order opinion), and the supreme court denied review. The district court subsequently granted American Hardware's motion for summary judgment on the Oak Grove claim. It determined that the activities at Oak Grove occurred in 1973 and later, when the policies contained the UL–21 endorsement.

The remaining factual issues were tried, and the jury determined: (1) Gopher did not expect or intend the actual injury at the Arrowhead site; (2) the disposal of oil sludge caused actual injury at the Bellaire site; (3) Gopher did not expect or intend the actual injury at the Bellaire site; (4) the disposal of oil sludge caused actual injury at the Brooklyn Park site; (5) the actual injury occurred from 1954 to 1966; and (6) Gopher did not

expect or intend the actual injury at the Brooklyn Park site. The court conducted an additional three-day bench trial on nonjury issues and issued its final order on December 31, 1997, amended January 28, 1998. American Hardware and Gopher appeal from the pretrial, trial, and final orders, claiming a total of 18 separate grounds for reversal.

## ISSUES

I. Did the district court err in holding that insurance policies purchased by a predecessor corporation provide coverage to a successor corporation?

II. Did the district court err in granting summary judgment to American Hardware on the Oak Grove claim?

III. Did the district court err in its jury instructions?

IV. Does the evidence reasonably support the jury's findings of fact?

V. Did the district court err in its other evidentiary and procedural rulings or in its substantive findings?

VI. Did the district court err in its award, denial, or allocation of defense and indemnification costs?

## ANALYSIS

### I

Interpretation of an insurance policy's coverage and the application of that determination to undisputed facts present questions of law, which are reviewed de novo. *Vue v. State Farm Ins. Cos.*, 582 N.W.2d 264, 265 (Minn.1998). Unambiguous and undefined terms in a policy must be given their plain, ordinary, or popular meaning. *Jenoff, Inc. v. New Hampshire Ins. Co.*, 558 N.W.2d 260, 262 (Minn.1997). Ambiguous terms are to be resolved against the insurer and in accordance with the reasonable expectations of the insured. *Id.* (citing *Columbia Heights Motors, Inc. v. Allstate Ins. Co.*, 275 N.W.2d 32, 36 (Minn.1979)). The guiding principle for judicial interpretation of coverage provisions is to give effect to the intentions of the parties as reflected in the terms of the insur-

ing contract. *Minnesota Mining & Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d 175, 179 (Minn.1990).

■ American Hardware challenges the district court's ruling that Gopher is covered under the policies issued to Gopher State because the policies included a provision that American Hardware was not bound by an assignment of interest under the policy without its consent. It is undisputed that neither Gopher State nor Gopher obtained American Hardware's express consent to the assignment of interest under the policy. In ruling that Gopher was covered by the policy irrespective of American Hardware's consent, the district court distinguished between the assignment of a risk, which changes the policy's covered activities, and the assignment of a loss, which assigns a claim arising from a covered activity during the policy period. *See Ocean Accident & Guar. Corp. v. Southwestern Bell Tel. Co.*, 100 F.2d 441, 444 (8th Cir.1939) (making same distinction); *Windey v. North Star Farmers Mut. Ins. Co.*, 231 Minn. 279, 283, 43 N.W.2d 99, 102 (1950) ("Assignment, after loss, * * * does not constitute an assignment of the policy, but only of a claim or right of action on the policy. Such an assignment does not void the policy under a provision that if it is assigned without the insurer's consent it shall become void.").

Minnesota appellate courts have not directly addressed the question of whether a nonassignment-without-consent clause is enforceable against a successor corporation that acquires a predecessor's assets and liabilities. Courts in other jurisdictions have refused to enforce such a clause when a successor corporation's acquisition of a predecessor's assets transfers the predecessor's losses. *See, e.g., Northern Ins. Co. v. Allied Mut. Ins. Co.*, 955 F.2d 1353, 1358 (9th Cir. 1992) (purchase of substantially all of predecessor's assets transferred insurance coverage to successor by operation of law); *National Am. Ins. Co. v. Jamison Agency, Inc.*, 501 F.2d 1125, 1128–30 (8th Cir.1974) (listing exceptions to enforcement of nonassignment-without-consent clause and declining to enforce provisions in sale of assets between partners that assigned all assets and also assigned losses); *B.S.B. Diversified Co. v. American Motorists Ins. Co.*, 947 F.Supp. 1476, 1480–81 (W.D.Wash.1996) (contract for sale of all assets transferred insurance coverage and coverage also transferred by operation of law).

■ The purpose of a non-assignment clause is to protect the insurer from an increase to the risk it has agreed to insure. *National Am. Ins.*, 501 F.2d at 1128; 3 *Couch on Insurance* § 35:3 (3d ed.1995). But when events giving rise to an insurer's liability have already occurred, the insurer's risk is not increased by a change in the insured's identity. *National Am. Ins.*, 501 F.2d at 1128.

■ An assignment of a loss does not expand the risk to cover other activities; it only allows a change in the identity of the insured to reconnect the policy's coverage to the insured loss. *Id.* at 1129–30; *Ocean Accident*, 100 F.2d at 444–45; *Couch, supra,* § 35:7; *see Northern Ins.*, 955 F.2d at 1358 (agreeing with *Ocean Accident*'s analysis that "rationale for honoring 'no assignment' clauses vanishes when liability arises from presale activity"). This transfer of liability addresses the problem created when an insurer becomes liable at the time there is an accident or occurrence covered under the policy but the loss is enforced against a successor owner. *Citicorp Indus. Credit, Inc. v. Federal Ins. Co.*, 672 F.Supp. 1105, 1107 (N.D.Ill. 1987) (when event has occurred that creates liability under an indemnity or liability policy, the policy or rights may be assigned with or without consent of insurer).

The great majority of courts follow this distinction between risk and loss and allow an insured to assign a loss. *Couch, supra,* § 35:7. The purchase agreement at issue provided that Gopher State would "assign all the assets" of Gopher State to Bame Oil. Although not assigned specifically, the court found the assignment of "all the assets" also assigned Gopher State's losses to Bame Oil and then to Gopher. The court's reasoning is consistent with the cases refusing to enforce nonassignment-without-consent clauses and the rationale that supports not enforcing the clauses.

American Hardware's attempt to rely on Minnesota case law to argue against the majority rule is unavailing. Both of the cases it cites are inapposite because the successor corporations in those cases attempted to obtain coverage for a loss that arose after the successor acquired the predecessor corporation. *See Closuit v. Mitby,* 238 Minn. 274, 275–76, 56 N.W.2d 428, 429 (1953); *Yoselowitz v. Peoples Bakery, Inc.,* 201 Minn. 600, 601–05, 277 N.W. 221, 222–24 (1938); *see also Couch, supra,* § 35:7 (Supp.1998) ("The purpose of a no assignment clause is to protect the insurer from increased liability, and after events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity."). American Hardware's reliance on authority from other states similarly overlooks the factual distinctions in these cases that demonstrate an increased risk. *See Argonaut Southwest Ins. Co. v. American Home Assurance Co.,* 483 F.Supp. 724, 728 (N.D.Tex.1980) (providing coverage to uninsured division of company would increase risk by expanding activities covered), *aff'd* 636 F.2d 311 (5th Cir.1981); *Qualman v. Bruckmoser,* 163 Wis.2d 361, 471 N.W.2d 282, 284 (Wis.App.1991) (providing coverage on contract and misrepresentation claims would increase risk by expanding activities covered). The losses at issue here occurred before Gopher acquired Gopher State, and extending coverage to Gopher does not increase American Hardware's risk. *See Northern Ins.,* 955 F.2d at 1358 (a successor's characteristics are not important because the insurer still covers only "the risk it evaluated when it wrote the policy").

In a subsidiary argument, American Hardware maintains that, because the claims against Gopher are based on CERCLA and MERLA, no loss could have occurred until these laws were enacted. *See Quemetco, Inc. v. Pacific Auto. Ins. Co.,* 24 Cal.App.4th 494, 29 Cal.Rptr.2d 627, 631 (Cal.App.1994) (successor corporation not covered for contamination occurring in 1950s and 1960s because loss did not occur until Congress enacted CERCLA in 1980, after policies' coverage periods), *review denied* (Cal. July 14, 1994). The Minnesota Supreme Court, however, has held that a loss occurs at the time of contamination, even if the claim is brought under subsequently enacted legislation. *Minnesota Mining & Mfg.,* 457 N.W.2d at 183 (recognizing longstanding prohibition of contamination of groundwater predating CERCLA and MERLA). Under Minnesota law, the losses occurred during Gopher State's policy period, and *Quemetco* does not apply.

■ American Hardware's final argument on coverage is based on a policy exclusion for "all liabilities assumed by contract." American Hardware claims this exclusion relieves it of any duty to defend or indemnify Gopher because the agreement between Gopher State and Bame Oil, transferring and assigning assets and liabilities, is a liability assumed by contract. This exclusion for assuming liabilities by contract serves the same purpose as the policy provision preventing the assignment of risk: to prevent an increase in risk to the insurer. Gopher's purchase of Gopher State created no fundamental change in the insured entity and is not the type of liability assumption that the contract provision is intended to prohibit. Consistent with the assignment-of-loss theory, the policy's exclusion should not be read in such a manner as to entitle an insurer to the windfall of not having to insure an occurrence that it received premiums for covering.

The district court did not err in its interpretation of the policy or in finding that Gopher State assigned its losses to Gopher and that American Hardware had a duty to defend and indemnify Gopher. Because we find the district court properly determined that American Hardware's policies cover Gopher, we do not reach Gopher's alternative argument that it is entitled to coverage under a de facto merger theory.

## II

### Summary Judgment on Oak Grove Claim

■ The district court granted summary judgment dismissing Gopher's claim for defense and indemnity on the Oak Grove site because Gopher's liabilities at that site arose from activities that started in 1973. As of July 1972, American Hardware had added to both its CGL and its commercial umbrella

policies the UL–21 endorsement limiting coverage for pollution-related property damage to sudden and accidental occurrences. Gopher challenges the ruling that the umbrella policy contained the UL–21 endorsement. It asserts the endorsement lacked a proper evidentiary foundation, American Hardware indemnified two other parties based on policies for the years after 1972, and American Hardware failed to file the endorsement with the Minnesota Commissioner of Insurance.

■ Gopher's claims of error on the summary judgment all relate to evidentiary issues, on which the district court has a considerable latitude of discretion. *Benson v. Northern Gopher Enters., Inc.,* 455 N.W.2d 444, 445 (Minn.1990) (evidentiary rulings committed to sound discretion of district court). The evidentiary foundation for admission of the endorsement included testimony that American Hardware received a copy of the declaration page for Gopher's commercial umbrella policy from its reinsurer. The declaration page indicated the policy was subject to the UL–21 endorsement. Walter Bottemiller, an American Hardware employee, stated in an affidavit that he recognized the declaration page as covering Gopher and identified the UL–21 endorsement. It was within the court's discretion to reject Gopher's objection that the declaration page was undated and was not from American Hardware's own file, and to rule that the foundation was sufficient. *See* Minn. R. Evid. 901(b)(1) (testimony of witness with knowledge meets requirement for authentication or identification).

■ The district court also rejected Gopher's argument that the policies did not contain the UL–21 endorsement because American Hardware defended two other entities for pollution-related activities during that same time period. The record does not establish that Gopher demonstrated that the entities, Ranger Chevrolet and Dean's Oil, were insured under a commercial umbrella policy. But whether or not it was the same type of policy, American Hardware's defense of other insureds is not relevant to its duty to defend Gopher. *See* Minn. R. Evid. 401 (relevancy requires probative value).

■ Gopher's final objection to the UL–21 endorsement is that American Hardware did not demonstrate that the endorsement was filed with the Minnesota Commissioner of Insurance as required by Minn.Stat. § 70A.06, subd. 2 (1971). American Hardware offered an affidavit that its standard practice is to file endorsements with the commissioner. Gopher introduced no evidence demonstrating American Hardware did not file the form. Based on the uncontradicted evidence, the court did not err in finding the commercial umbrella policy contained the UL–21 endorsement. The evidence adequately supports the admissibility of the UL–21 endorsement and the district court's ruling on it to grant summary judgment in favor of American Hardware on the Oak Grove claims.

## III

*Jury Instructions on "Expected or Intended" and "Actual Injury"*

■ We review jury instructions to determine whether, taken as a whole, they are confusing or misleading on a material issue. *Lindstrom v. Yellow Taxi Co.,* 298 Minn. 224, 229, 214 N.W.2d 672, 676 (1974). The district court has broad discretion in choosing the form and language of jury instructions so long as the entire charge fairly and adequately states the law applicable to the case. *Alholm v. Wilt,* 394 N.W.2d 488, 490 (Minn.1986).

■ The court instructed the jury on "expected or intended" property damage with language taken from *Domtar, Inc. v. Niagara Fire Insurance Co.,* 563 N.W.2d 724, 735 (Minn.1997). American Hardware argues that part of the instruction requiring a "high degree of certainty" was taken out of context and injected error into the instruction. The court instructed the jury:

American Hardware has the burden of establishing that the actual injury to property was expected or intended from the standpoint of Gopher. American Hardware must establish that Gopher expected to a high degree of certainty that the same general type of damage for which the remedial action was sought.

Expected conduct may be equated with reckless conduct. This standard does not preclude the use of circumstantial evidence or proof of willful blindness * * *.

The instruction accords with the standard set forth in *Domtar* interpreting the meaning of "expected" damage to require a "certainty" of harm, equating this "high degree of certainty" with reckless conduct. *See id.* The instruction was not misleading or confusing and accurately stated the law.

■■■ American Hardware also contends that the district court's instruction on when an "actual injury" occurs was erroneous. The court instructed the jury:

Environmental contamination of the soil is considered to be a type of actual injury to the soil. Gopher has the burden of establishing that an actual injury has occurred. * * *

The actual injury for purposes of insurance coverage may not necessarily occur at the time that the act was committed which leads to damage, but rather at the date there is actual damage to the property.

The instruction follows the well-settled standard for when an actual injury occurs. *See Fairview Hosp. & Health Care Servs. v. St. Paul Fire & Marine Ins. Co.*, 518 N.W.2d 41, 44 (Minn.App.1994) (triggering event for coverage is an actual injury, "such as contamination of groundwater or soil"), *aff'd*, 535 N.W.2d 337 (Minn.1995). An actual injury can occur when a party disposes of contaminants in the ground. *Ray Indus., Inc. v. Liberty Mut. Ins. Co.*, 974 F.2d 754, 765–66 (6th Cir.1992) (injury occurred when contaminants were placed in landfill); *TBG, Inc. v. Commercial Union Ins. Co.*, 806 F.Supp. 1444, 1452–53 & n. 7 (N.D.Cal.1990) (injury occurred when contaminants were released on property); *Fairview Hosp. & Health Care Servs. v. St. Paul Fire & Marine Ins. Co.*, 535 N.W.2d 337, 342 (Minn.1995) (actual injury could occur immediately if waste is not in sealed containers and disposal site does not have a liner or leachate collection system). The district court did not misstate the law in instructing the jury on "actual injury."

## IV

*Adequacy of Evidence to Support Jury Verdict on Expected or Intended Injuries*

■■■ A jury's special verdict form answers can be set aside "only if no reasonable mind could find as did the jury." *Domtar,* 563 N.W.2d at 734 (citation omitted); *see Hughes v. Sinclair Mktg., Inc.,* 389 N.W.2d 194, 198 (Minn.1986) (jury verdict will be sustained on any reasonable theory based on the evidence). We will set aside a jury's verdict only if the evidence, viewed in the light most favorable to the verdict, contradicts the verdict. *Id.*

■■■ American Hardware argues the jury erred in finding Gopher State did not expect or intend the actual injuries that occurred at the Arrowhead site from 1961 to 1976. The jury heard evidence that, during the 1960s and 1970s, the odor, the visual damage, and the danger of surface runoff were the only known dangers from disposing of the oil sludge on the property. This included a letter from the MPCA's executive director that stated, "the site in part is saturated with oil and [is] physically unattractive" and that the problem appeared to be odors "rather than water pollution." The jury also heard testimony that industrial practice at the time did not consider groundwater contamination in evaluating the effects of pollution. The jury could reasonably find that Gopher State did not expect or intend the actual injuries at the Arrowhead site during the years from 1961 to 1976. *See Domtar,* 563 N.W.2d at 735 (testimony provided by Domtar's expert supported the reasonableness of the jury's conclusion).

■■■ American Hardware challenges the adequacy of the evidence to support the jury's finding that actual injury occurred at the time Gopher State disposed of oil sludge in the dump sites. It asserts dump sites were expected to receive contaminants and thus the oil sludge did not cause injury and, alternatively, that any injury did not occur at the time of disposal but years later. Although evidence demonstrated that regulatory procedures evolved from laxer to more stringent standards, American Hardware did not demonstrate through evidence, statute,

or case law that the nature of a dump site negates actual injury to the surrounding environment. With respect to the timing of the "actual injury," the evidence was disputed, but the record contains competent evidence from witnesses who testified that actual injuries occurred when Gopher State disposed of oil sludge in the dump sites through the mixing of the oil sludge and soil at the sites. The jury's findings have support in the record.

American Hardware's last jury-verdict challenge is to the finding that Gopher State disposed of oil sludge at the Brooklyn Park site each year between 1954 and 1966. By focusing only on the testimony of one witness, who testified Gopher State did not dispose of oil sludge until 1965 or 1966, American Hardware overlooks the other testimony indicating that Gopher State disposed of oil sludge throughout the period. The jury's verdict on each of these issues is adequately supported by the evidence.

## V

*Evidentiary and Procedural Rulings and the District Court's Findings Relating to the Arrowhead Site*

■ American Hardware raises a cluster of issues that relate to its liability for activities at the Arrowhead site. The first issues relate to evidentiary rulings. American Hardware argues that the district court erred during the jury trial by excluding Arrowhead Refining's separate insurance policies issued by Travelers Insurance Group. American Hardware asserts that it was prejudiced by this ruling because the other policies demonstrate that its policies should not cover any liabilities of Gopher as an "operator" of the Arrowhead site. We are not persuaded that the ruling constituted prejudicial error.

■ Once Gopher established a prima facie case of coverage, the burden shifted to American Hardware to demonstrate that its policies excluded coverage. *SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 313 (Minn.1995). Gopher's liability as an "operator" stems from advice provided by Romness and Bob Gessner, a Gopher State engineer,

on Arrowhead Refining's operations in claims brought by the United States against Gopher. Gopher established coverage for the activities under its policy, and American Hardware pointed to no exclusion in American Hardware's policies for an "operator" status. As the district court noted, American Hardware's refusal to defend Gopher in this litigation weighs against its belated claim that Gopher was not liable for the injuries. American Hardware has not shown an abuse of discretion in excluding Arrowhead Refining's policies or that any exclusion caused prejudice requiring a new trial. *See Kroning v. State Farm Auto. Ins. Co.*, 567 N.W.2d 42, 46 (Minn.1997) (new trial appropriate only when appellant shows evidentiary ruling created prejudicial error).

■ American Hardware also argues that the district court violated Minn. R. Civ. P. 49.01 by allowing the jury to review sample insurance policies from the periods at issue and Gopher exhibits setting out specific insurance policy periods. The rule provides:

> The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. * * * Except as provided in Rule 49.01(b), neither the court nor counsel shall inform the jury of the effect of its answers on the outcome of the case.

Minn. R. Civ. P. 49.01(a). Rule 49.01 relates to statements by the court or counsel and does not directly address what evidence is appropriate for the jury to review. The cases American Hardware relies on involve improper statements by counsel or the court. *See, e.g., Hassler v. Simon*, 466 N.W.2d 434 (Minn.App.1991) (improper statement by trial court); *State Farm Fire & Cas. Co. v. Short*, 448 N.W.2d 560 (Minn.App.1989) (improper statement by counsel), *aff'd* 459 N.W.2d 111 (Minn.1990). The jury is permitted to review exhibits allowed into evidence so long as it is not an abuse of discretion. Minn.Stat. § 546.15 (1996) ("the jury may take with them all papers received in evidence except depositions"); *Larson v. Midland Coops., Inc.*, 305 Minn. 256, 259, 232 N.W.2d 810, 812 (1975) (whether jury reviews exhibits is in the district court's discretion). The court did not violate rule 49.01 or abuse

its discretion by allowing the jury to review the policies.

### Operation of Arrowhead Site

A district court's findings "will not be reversed unless manifestly and palpably contrary to the evidence." *Malmin v. Grabner*, 282 Minn. 82, 86, 163 N.W.2d 39, 41 (1968). American Hardware argues that the court erred in finding the soil and groundwater at the Arrowhead site were not owned by, or in the care, custody or control of Gopher during the years 1961 through 1976.

Romness, Orville Kemp, and Bill Bofey purchased Arrowhead Refining in 1961. Eventually Romness, Kemp, and William Heino owned the corporation. Although Romness was an owner of both Arrowhead Refining and Gopher State, the corporations were distinct entities. Heino testified he considered Romness and Gessner to be in charge of Arrowhead Refining's operations. But he also testified that he was Arrowhead Refining's president and that he did bookkeeping, handled inventory, and managed accounts. Moreover, a corporation may be liable as an operator of a site even if it does not own the property or maintain it under its care, custody, or control. *See Musicland Group, Inc. v. Ceridian Corp.*, 508 N.W.2d 524, 532–33 (Minn.App.1993) (if corporation's operations caused the migration of contaminants on nearby property it may be deemed an "operator" of nearby property), *review denied* (Minn. Jan. 27, 1994). Despite Gopher's status as an "operator," the record supports the court's finding that Gopher did not control the Arrowhead site.

### Directed Verdict on Actual Injury at Arrowhead Site

Reviewing a directed verdict, this court independently determines if the evidence was sufficient to present a fact question to the jury. *Boone v. Martinez*, 567 N.W.2d 508, 510 (Minn.1997). The evidence is viewed in the light most favorable to the nonmoving party. *Id.* A directed verdict is appropriate if the evidence does not present a question of fact to the jury. *Vanden Broucke v. Lyon County*, 301 Minn. 399, 404, 222 N.W.2d 792, 795 (1974).

At the close of American Hardware's case, Gopher moved for a directed verdict that an actual injury occurred at the Arrowhead site each year from 1961 to 1976. The court granted the motion based on the uncontradicted evidence. It was undisputed that Arrowhead Refining operated from 1961 to 1976. In addition, John Erdmann testified contamination occurred each time Arrowhead Refining placed oil sludge into the sludge lagoon. Norman Wenck similarly testified that an actual injury occurred each time a party disposed of oil sludge. Viewing the uncontradicted evidence in a light most favorable to American Hardware, the evidence supported the directed verdict that an actual injury occurred throughout Arrowhead Refining's operation.

Beyond the actual injury, American Hardware disputes the sufficiency of the evidence supporting the conclusion Gopher State contributed to an actual injury each year at the Arrowhead site. The record indicates Gopher State sent Arrowhead Refining 24,000 gallons of oil. Although the parties dispute whether all of this was waste oil, Gopher settled the claim in good faith due to its potential liability for the entire amount. The evidence supports the conclusion that Gopher State supplied Arrowhead Refining with waste oil continuously from 1961 to 1973. *See Domtar*, 563 N.W.2d at 732–33 (in difficult cases when exact dates are uncertain, court can presume continuous damage between a proven start date and an ending date); *Northern States Power Co. v. Fidelity & Cas. Co.*, 523 N.W.2d 657, 663–64 (Minn. 1994) (same). In addition, Gopher's liability was also based on its alleged role as an "operator" of the Arrowhead site throughout the period. Its operator status serves as an independent basis for the court's directed verdict that Gopher State caused actual injury throughout the period. We affirm the court's directed verdict that an actual injury occurred at the Arrowhead site each year between 1961 and 1976.

### American Hardware's Known–Loss Defense on Arrowhead Claim

Insurance cannot be issued for a known loss because there is no longer a risk.

*Waseca Mut. Ins. Co. v. Noska,* 331 N.W.2d 917, 925 n. 6 (Minn.1983). An insurer may defend against a claim using the known-loss defense if the insured knew of the loss when it applied for the policy. *Id.* The known-loss defense requires proof the insured withheld material information about known property damage for which the insured subsequently obtained insurance. *Domtar,* 563 N.W.2d at 737. American Hardware argues Gopher State knew that the disposal of oil sludge at the Arrowhead site was causing an actual injury. Heino testified that Romness knew about the sludge lagoon and the dead vegetation surrounding it. But at best his testimony demonstrated Gopher State knew that the oil sludge was unsightly and a risk to surface water. It did not establish Gopher State knew that the oil sludge disposal was causing soil and groundwater contamination. *See Domtar, Inc. v. Niagara Fire Ins. Co.,* 552 N.W.2d 738, 747 (Minn.App.1996) (known-loss defense requires evidence that the insured knew of the loss, not that the insured knew of the acts leading to the loss), *aff'd in part, rev'd in part on other grounds,* 563 N.W.2d 724 (Minn.1997). As in *Domtar,* there is no evidence in the record that Gopher State knew of the loss. The known-loss defense does not, as a matter of law, bar Gopher's recovery.

# VI

## *Defense and Indemnification Costs*

 An insured may recover its defense costs in a declaratory judgment action against an insurer based on a breach by the insurer of its duty to defend. *Morrison v. Swenson,* 274 Minn. 127, 137–38, 142 N.W.2d 640, 647 (1966). This court reviews the award of fees and costs under an abuse-of-discretion standard. *Domtar,* 563 N.W.2d at 740. Findings of fact that underlie or effectuate a fee award are reviewed under a "clearly erroneous" standard. Minn. R. Civ. P. 52.01. American Hardware disputes (1) the reasonableness of the Arrowhead settlement, (2) the allocation of liability for the settlement, (3) the allocation of defense costs, and (4) the award of defense costs on Gopher's dismissed claims. Gopher disputes (5)

the district court's denial of pre-tender defense costs.

### *(1) Reasonableness of Arrowhead Settlement*

 American Hardware argues the district court erred by finding the $1,225,000 settlement amount for the Arrowhead claim was reasonable, but does not provide support for its argument. The undisputed testimony of the attorney who defended Gopher on the Arrowhead claim established that (1) the estimated clean-up costs of the Arrowhead site were approximately $38 million; (2) the settlement was reasonable and prudent based on Gopher's joint and several liability for the entire amount; (3) the evidence showed Gopher employees assisted Arrowhead Refining in its operations; and (4) future defense and trial costs that would be incurred in defending the claim. The record supports the district court's finding that the settlement amount was reasonable.

### *(2) Allocation of Liability for Settlement*

 In its challenge to the allocation of the settlement liability, American Hardware first asserts that the district court erred in allocating more than one-third of the Arrowhead settlement to Gopher because Bame and Gopher Rubber Cote were also defendants whose liability was determined in the settlement. But American Hardware did not introduce evidence demonstrating that it was reasonable to divide the $1,225,000 settlement equally. The evidence on the allocation consisted of undisputed testimony of Gopher's defense attorney that $10,000 was a reasonable allocation of Bame's and Gopher Rubber Cote's combined share of the settlement. This testimony was buttressed by other evidence indicating Arrowhead Refining ceased its operations and disposal of oil sludge in 1976 and that most of the contamination was due to the disposal of oil sludge at the site. The record supports the district court's finding.

 Second, American Hardware argues the court erred by dividing the settlement liability into pro rata shares for the 13 years from 1961 to 1973 and then excluding the 1973 share because of the UL–21 endorse-

ment. American Hardware maintains that the allocation is inconsistent with the court's finding that actual injury occurred from 1961 to 1976, and the claim against Gopher that included the period 1976 to 1981.

American Hardware offered no evidence that Gopher sent waste oil or provided advice to Arrowhead Refining between 1973 and 1976. Gopher, however, introduced evidence that it did not ship waste oil during those years. The record supports the court's use of 1973 as the cutoff date. Arrowhead Refining shut down its operations in 1976. Nothing in the record indicates Gopher contributed additional contamination to the site between 1976 and 1981. The record supports the district court's use of the period from 1961 to 1973, the court's exclusion of the years 1976 to 1981, and the exclusion of 1973 based on the UL–21 endorsement.

■ Finally, American Hardware argues that it is not liable for Gopher's activities at the Arrowhead site because it acted as an operator, which was not an insured activity. We note initially that the policy does not exclude "operating" activity and that the settlement did not assign any "operator" responsibility to Gopher. But whether or not "operating" has legal significance, the district court found that the contaminated soil and groundwater at the Arrowhead site were not owned by, or in the care, custody, or control of Gopher during the years 1961 through 1976. The district court's findings have the requisite support in the record, and we find no reversible error in the court's allocation of the settlement liability.

### (3) Arrowhead Defense Costs

■ American Hardware argues that the district court should have divided the defense costs equally among Gopher, Gopher Rubber Cote, and Bame. American Hardware produced no evidence that an equal division would be reasonable. The district court reasonably relied on the testimony of Gopher's defense attorney that the amount of costs attributable to Bame and Gopher Rubber Cote was "a very very small amount" and on the court's own review of the record that demonstrated "the facts and legal theories

involved in all sites, including Oak Grove, were so closely intertwined that a segregated billing would have been extremely difficult, if not impossible, to create." *See Domtar*, 563 N.W.2d at 740–41 (holding trial court did not abuse its discretion in awarding all defense costs when billing was not segregated). In addition, as the district court observed, American Hardware could have avoided any question of defense cost allocation by acting on its duty to defend Gopher. *See id.* at 740 (citing *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 790 F.Supp. 1339, 1345 (E.D.Mich. 1992) (had insurer accepted tender of defense there would have been no dispute about reasonable and necessary defense costs)). The record supports the court's allocation of defense costs on the Arrowhead claim.

### (4) Defense Costs for Oak Grove and Other Dismissed Claims

■ The district court awarded defense costs on the Oak Grove and other dismissed claims after concluding that the costs were reasonable and were "intertwined and related to the issues of duty to defend and duty to indemnify." We reject American Hardware's citation of error on the court's award for three reasons. First, a party may recover defense costs in a declaratory action on unsuccessful claims so long as it prevails at trial. *Id.* at 741 (affirming award of defense costs on claim not submitted to the jury). Gopher prevailed on the majority of its claims at trial. Second, Gopher's claims, except for Oak Grove, are within the scope of the policy's coverage. Although American Hardware relies on authority that involves claims outside the policy's scope, it does not dispute that the other dismissed claims were covered. The claims are parallel to those litigated and come within the policy. *See Meadowbrook, Inc. v. Tower Ins. Co.*, 559 N.W.2d 411, 416 (Minn.1997) (insurer's duty to defend claims arguably within coverage extends until no basis for indemnification). Finally, an insurer's ability to dispute the reasonableness of attorney fees is diminished when it has improperly declined a tender of defense. *Domtar*, 563 N.W.2d at 740. The court did not abuse its discretion in awarding Gopher defense costs on its dismissed claims.

*(5) Pre-tender Defense Costs*

Generally an insurer is not responsible for defense costs incurred prior to the tender of a defense request, but circumstances may justify a departure from the general rule. *Id.* at 739. Gopher argues that the district court erred in denying pretender defense costs because American Hardware's denial of its insurance relationship with Gopher misled Gopher and delayed its claims.

The record confirms that American Hardware chose to deny coverage until Gopher could provide evidence that American Hardware's policies covered the claim, even though American Hardware had file copies of Gopher's claim experience cards from 1953 to 1975. But the evidence does not demonstrate that American Hardware knew it had sold CGL policies to Gopher and, instead, shows that (1) neither party retained its copy of the policies; (2) neither party was certain Gopher State had purchased CGL policies from American Hardware; (3) American Hardware denied defense on the Oak Grove claim in good faith because the claimed events occurred when its policies contained the UL–21 endorsement; (4) any claimed reliance on the Oak Grove denial is unjustified because the other three sites were covered by policies issued before the UL–21 endorsement; and (5) American Hardware is not equitably estopped because it has not been shown that it misrepresented its knowledge about the extent or existence of unidentified policies. Gopher had the initial burden to establish coverage and, in order to recover pre-tender defense costs, the ultimate burden to demonstrate bad-faith denial. The evidence does not demonstrate bad-faith denial, and we affirm the court's refusal to award pre-tender defense costs.

## DECISION

Gopher is entitled to recover under the American Hardware insurance policies purchased by its predecessor, Gopher State. We affirm the district court on all of the other issues raised by the parties.

**Affirmed.**

SHORT, Judge (dissenting).

I respectfully dissent. First, it is undisputed American Hardware did not insure Gopher Rubber Cote and Fred Bame personally. Given this fact, the trial court incorrectly required the insurer to pay $180,031.21 in post-tender defense fees and costs related to the Arrowhead litigation.

And second, a trial court cannot retroactively create an insurance relationship. Gopher is not an "insured," and there was no valid assignment of the policy. *See Yoselowitz v. Peoples Bakery, Inc.*, 201 Minn. 600, 604, 277 N.W. 221, 224 (1938) (stating benefits of policy do not extend to successor without valid assignment); *see also Ocean Accident & Guar. Corp. v. Southwestern Bell Tel. Co.*, 100 F.2d 441, 444 (8th Cir.1939) (recognizing that liability insurance policies are not assignable without consent of parties); *Argonaut Southwest Ins. Co. v. American Home Assurance Co.*, 483 F.Supp. 724, 727 (N.D.Tex.1980) (refusing to ignore insurance policy's clear and specific exclusion by recognizing assignment), *aff'd*, 636 F.2d 311 (5th Cir.1981); *Closuit v. Mitby*, 238 Minn. 274, 281, 56 N.W.2d 428, 432 (1953) (noting, in absence of valid assignment, insurance policies do not attach to insured property). Whether we use the word "risk" or "loss" is immaterial because there was no claim or right of action on the policy until after Gopher's succession. *See Ocean*, 100 F.2d at 444 (noting assignment of loss only permissible after right of action arises); *Citicorp Indus. Credit, Inc. v. Federal Ins. Co.*, 672 F.Supp. 1105, 1107 (N.D.Ill.1987) (holding purchaser of insured's rights may only assert claim for losses occurring before assignment). Moreover, the plan of liquidation transfers all corporate assets, subject to assumption of known or unknown corporate liabilities. Thus, Gopher expressly assumed, by contract, the environmental liabilities for which it now seeks insurance coverage. Under these circumstances, I would reverse the trial court's determination of insurance coverage.